David PUTNAM Plaintiff,

v.

TOWN OF SAUGUS, MASSACHU-SETTS, John Vasapolli, Individually and In His Official Capacity as Town Manager for the Town of Saugus, Massachusetts, Andrew Bisignani, Individually and In His Official Capacity as Town Manager for the Town of Saugus, Massachusetts, Defendants.

No. CIV.A.03–12062–WGY.

United States District Court, D. Massachusetts.

April 7, 2005.

Laurie A. Frankl, Rodgers, Powers & Schwartz LLP, Harvey A. Schwartz, Rodgers, Powers & Schwartz LLP, Boston, MA, for Plaintiff.

Joseph L. Tehan, Jr., Kopelman & Paige, PC, Boston, MA, for Defendants.

*MEMORANDUM AND ORDER*

YOUNG, Chief Judge.

This case arises from events surrounding the appointment of a new police chief to the Saugus, Massachusetts ("Saugus" or "Town") Police Department. The plaintiff David Putnam ("Putnam"), a lieutenant in the Saugus Police Department, brought suit against John Vasapolli ("Vasapolli"), the former Saugus Town Manager, Andrew Bisignani ("Bisignani"), the current Saugus Town Manager, and the Town of Saugus alleging that he was unlawfully passed over for the police chief position on

two separate occasions. Compl. ¶ 1 [Doc. No. 1]. Putnam alleges that he was passed over for the position in retaliation for his testimony before the State Ethics Commission regarding an incident in which a member of the Saugus Board of Selectmen was stopped by police for driving while intoxicated but, because of his political influence, was not charged. *Id.* Putnam claims that he was also bypassed in retaliation for a police report he drafted about the same incident. *Id.* at ¶ 50.

Putnam alleges violations of his First Amendment rights under 42 U.S.C. § 1983 by all of the defendants and a violation of Mass. Gen. Laws ch. 149, § 185 by the Town of Saugus. The defendants have moved for summary judgment on all of Putnam's claims.

## A. Factual Background

The following recitation of facts is taken from Putnam's Complaint, Putnam's Statement of Contested Fact and exhibits attached thereto [Doc. No. 29], Defendants' Statement of Facts of Record as to Which There is no Genuine Issue to be Tried and exhibits attached thereto [Doc. Nos. 24, 35], Putnam's Memorandum in Support of Opposition to Summary Judgment [Doc. No. 28], and Defendants Vasapolli's and Bisignani's Memorandum in Support of Summary Judgment [Doc. No. 23].

For purposes of deciding Defendants' Motions for Summary Judgment, where a factual dispute exists, the Court must take Putnam's version of the facts as true, where supported by record evidence, and draw all reasonable inferences in Putnam's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### 1. The Parties

Putnam has served as an officer in the Saugus Police Department since 1978.

Compl. ¶ 7. He is currently a lieutenant,[1] a rank he obtained in 1996 at which time he was first on the Civil Service list. *Id.*; Pl.'s Statement of Contested Material Facts ("Pl.'s Statement of Facts") ¶ 2. Throughout his tenure, Putnam has received numerous commendations and has never been disciplined. Compl. ¶ 7; Pl.'s Statement of Facts ¶ 2.

Putnam holds a Bachelor's degree in psychology and a Master's degree in criminal justice. Pl.'s Statement of Facts ¶ 1. Additionally, Putnam has taken college-level courses in criminal justice and many in-service training programs. *Id.* Civil Service examinations for Saugus Police Chief were administered in 1998 and 2002. *Id.* Putnam received the highest score on both examinations. *Id.*

The Town of Saugus is a municipal corporation organized under the laws of the Commonwealth of Massachusetts. Compl. ¶ 6.

Vasapolli has served as Saugus Town Counsel since 1981. Pl.'s Statement of Facts ¶ 9. From August 2002 until January 2003, Vasapolli also served as Acting Town Manager of Saugus. Compl. ¶ 4; Defs.' Statement of Material Facts ("Defs.' Statement of Facts") ¶ 5. As Acting Town Manager, Vasapolli was the appointing authority for the Saugus Police Department, including the position of temporary police chief. Compl. ¶ 4.

Bisignani was appointed Town Manager of Saugus in January 2003. Compl. ¶ 5; Defs.' Statement of Facts ¶ 7. As Town Manager, Bisignani was the appointing authority for the Saugus Police Department, including the position of permanent police chief. Compl. ¶ 5.

2. **Incidents Creating a Contentious Relationship Between the Saugus Police Department and the Saugus Board of Selectmen**

During the period relevant to this case, there were hostile interactions between members of the Saugus Board of Selectman[2] and members of the Saugus Police Department. Pl.'s Statement of Facts ¶ 4. During this period, Saugus police charged three of the five members of the Board with criminal activity and investigated the spouse of a fourth member. *Id.*

a. **Incident Involving Selectman Christie Ciampa**

One evening, sometime before July 2004, Putnam was the commanding officer on duty for the Saugus Police Department. Pl.'s Statement of Facts, Ex. 1, Dep. of David J. Putnam ("Putnam Dep.") at 175–76. That evening, Selectman Christie Ciampa ("Ciampa") was arrested for the crime of operating a motor vehicle under the influence of alcohol. *Id.* The arrest followed a motor vehicle accident in which Ciampa was involved. *Id.*

b. **Incident Involving Selectman Maureen Dever**

At some time in June 2004, the Saugus Police Department received a call from someone complaining about a speeding vehicle in the neighborhood. *Id.* at 176. The license plate number given by the caller was that of Selectman Maureen Dever's ("Dever") husband. *Id.* Following the call, Putnam dispatched a sergeant to Dev-

---

**1.** Lieutenant is the second highest rank in the Saugus Police Department in which there is no rank of Captain. Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Mem.") at 3.

**2.** The Board of Selectmen is the body which, among other things, appoints the Saugus Town Manager. Defs. John Vassapolli's and Andrew Bisgnani's Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") at 5.

er's home to investigate. *Id.* Although the Devers were not home when the sergeant arrived, the sergeant questioned Dever's husband on a later occasion. *Id.*

When word of the investigation was published in a newspaper's police log, Putnam received a telephone call from Selectman Dever who wanted to know what happened. *Id.* Putnam explained how the investigation arose from a complaint called in to the department. *Id.* at 176–77. To that, Dever replied that she and her husband were in Maine that evening and that the speeding complained of "never happened." *Id.* at 177. Dever expressed her suspicion that the complaint was falsely made because of "Saugus politics." *Id.* Putnam explained that if that was so, no one in the Saugus Police Department had been involved. *Id.* Dever appeared to accept that explanation. *Id.*

### c. Incident Involving Selectman Anthony Cogliano

Selectman Anthony Cogliano ("Cogliano") who operated several nightclubs in Saugus, frequently complained that he was harassed by Saugus police officers, including Putnam. Pl.'s Statement of Facts ¶ 4(a). In May 2003, shortly before Putnam was interviewed for the job of permanent police chief, Putnam ordered that criminal charges be brought against Cogliano for a liquor law violation arising from Cogliano's operation of a nightclub. Putnam Dep. at 130; Pl.'s Statement of Facts, Ex. 3, Dep. of Anthony Cogliano ("Cogliano Dep.") at 22; Defs.' Statement of Facts ¶ 41.

This charge stemmed from Cogliano's refusal to allow Saugus police officers to investigate after-hours drinking. Putnam Dep. at 124. The reason supplied by Cogliano for his refusal was that "John Vasapolli told me I don't have to let you in." *Id.* at 126. Cogliano pled to sufficient

facts on this charge shortly before Town Manager Bisignani bypassed Putnam for the position of permanent police chief. Pl.'s Statement of Facts ¶ 18. Town Manager Bisignani admits to reading the police report of the incident involving Selectman Cogliano. Pl.'s Statement of Facts, Ex. 5, Dep. of Andrew Bisignani ("Bisignani Dep.") at 33.

Prior to this incident, in 1998, Cogliano was involved in an altercation with Saugus Police Officer Scott Crabtree ("Crabtree"), in which Cogliano spoke abusively about Saugus police officers who refused to work paid details at Cogliano's nightclub. Pl.'s Statement of Facts ¶ 4(a). According to Crabtree, Cogliano told him, "I run that fucking department." Pl.'s Statement of Facts, Ex. 7, Aff. of Scott Crabtree ("Crabtree Aff.") at 4.

Cogliano also complained that Saugus police had broken into his office. Cogliano Dep. at 21. At different times during the events described above, Cogliano complained about police harassment to the Town Managers at the time including Steven Angelo ("Angelo"), Vasapolli, and Bisignani. *Id.* at 52. Cogliano also complained to Police Chief Edward Felix and later to Police Chief James MacKay ("MacKay"). *Id.* at 50–52.

### d. Incident Involving Selectman Michael Kelleher

On the evening of January 3, 2002 and early morning of January 4, 2002, Putnam was the officer in charge of the Saugus Police Department. Pl.'s Statement of Facts ¶ 5(b). That evening, Selectman Michael Kelleher ("Kelleher") had been socializing with then Town Manager Steven Angelo ("Angelo") and others at various Saugus nightclubs and bars. *Id.* at ¶ 5(c). Kelleher's final stop of the evening was a club managed by Selectman Cogliano. *Id.* Cogliano, who observed Kelleher to be in-

toxicated, advised him not to drive because Saugus police officers were in the club's parking lot. *Id.* Apparently, Kelleher ignored Cogliano's advice. *Id.*

Shortly after 2:00 a.m. Putnam, who was at police headquarters, heard the radio report of Officers Matthew Vecchio ("Vecchio") and Kevin Cabral ("Cabral") that they had stopped a motor vehicle on Hammersmith Drive in Saugus. Pl.'s Statement of Facts, Ex. 13, Jan. 16, 2002 Police Report of David J. Putnam ("Putnam Report"). Shortly thereafter, Putnam received a telephone call on his mobile telephone from Chief of Police Edward Felix ("Felix"), who ordered Putnam to call him at his home. Pl.'s Statement of Facts ¶ 5(d). When Putnam called, Felix asked him, "Do you know who they have stopped out there?" *Id.* Felix then informed Putnam that Officers Vecchio and Cabral had stopped Selectman Kelleher who "may be drunk." *Id.*

Felix told Putnam to instruct the officers to drive Kelleher home "as a personal favor to him [Felix]." *Id.* Felix explained to Putnam that "we'll get a lot of mileage out of this." *Id.* Felix further noted that he was trying to get a new contract and to get his son appointed to the police department. *Id.* As instructed, Putnam called officers Vecchio and Cabral and asked them what was happening. *Id.* at ¶ 5(e). They informed him that they had stopped Kelleher because he was driving erratically, that he appeared to be intoxicated, and that there was an empty beer can on the floor of his car. *Id.* Putnam then relayed Felix's "personal favor" request. *Id.* Putnam cautioned the officers, however, that the proper course of action was "their decision and that he would back them up 100 percent." *Id.* at ¶ 5(f).

By this, Putnam meant that if the officers decided not to extend the "personal favor" to Felix and instead arrested Kelle-

her, Putnam "would back them up and wouldn't allow them to be harassed." *Id.* Putnam then dispatched a sergeant to the scene with orders to reaffirm what he had told Vecchio and Cabral over the telephone. *Id.* Minutes later, Putnam received another call from Felix who demanded to know what was happening. *Id.* at ¶ 5(g). Putnam informed Felix that he had relayed the "personal favor" message but that he also told the officers that "if they decided to arrest Kelleher, [he] would stand behind them." *Id.*

To Putnam's statement, Felix replied, "I am getting tired of this shit with you, you don't show me any respect." Putnam Report. Putnam replied by stating, "I am getting sick of hearing that, I work as hard, if not harder than any Lieutenant you have. I certainly work harder than you ever did and I don't go around starting trouble like you used to. When you were a Lieutenant you used to advise me to 'bury the chief in grievances.' I don't do anything like that, I just mind my business and do my job. I am standing behind my men, the way you taught me to." *Id.* A few minutes later, Felix called Putnam again and ordered him to instruct Vecchio and Cabral to tell Kelleher to call him [Felix] at home. *Id.*

Officers Vecchio and Cabral drove Kelleher home without arresting him. *Id.* Later that morning, at police headquarters, Vecchio and Cabral informed Putnam that they were ready to arrest Kelleher but felt they could not after speaking to Felix on Kelleher's phone. *Id.* A few minutes later, Felix entered the office. *Id.* He immediately apologized to Vecchio, Cabral, and Putnam. *Id.* He further stated to Putnam, "You did the right thing, you always back up your men." *Id.* Felix added that "we will get some mileage out of this." *Id.*

Word of the Kelleher incident spread rapidly throughout Saugus. Pl.'s State-

ment of Facts ¶ 6. It was, in Vasapolli's words, "a very public event ... discussed by anybody politically involved in the town and people not politically involved in the town." Pl.'s Statement of Facts, Ex. 2, Dep. of John Vasapolli ("Vasapolli Dep.") at 39. On January 16, 2002, on the advice of his attorney, Putnam filed a formal police report of the events described above including his telephone conversations with Felix. Compl. ¶ 20.

Several of the police reports relating to the incident, including Putnam's, were "leaked" to the local media and printed. Pl.'s Statement of Facts ¶ 6. Later, a complaint about the Kelleher incident was made to the State Ethics Commission, which began an investigation. Compl. ¶ 21. Some, including Felix, believed Putnam was responsible for disclosing the incident to the press and reporting it to the State Ethics Commission. *Id.* at ¶ 22. Putnam maintains that he did neither. *Id.* Vasapolli also believed that someone from within the Police Department had released the information but had no opinion as to who that might be. Vasapolli Dep. at 41.

Within the next few days, Vasapolli and Town Manager Angelo discussed the event and Putnam's involvement in it. Pl.'s Statement of Facts ¶ 7; Vasapolli Dep. at 18–20. Angelo was quite upset that Putnam's report had been made public. Vasapolli Dep. at 22–23. Vasapolli too was upset about Putnam's report in that it included "personal statements" about Chief Felix and because it was not filed until almost two weeks after the events which it described. *Id.* at 28. Aside from

its inclusion of those "personal statements," however, Vasapolli denies taking issue with the fact that the report was written. *Id.*

In connection with the State Ethics Commission's investigation of the Kelleher incident, Putnam was questioned and later summoned to testify before the Commission on December 16, 2002. Pl.'s Statement of Facts ¶ 11. Putnam informed Chief Felix by e-mail that he would be testifying because the date of his testimony conflicted with a scheduled officer training program. Putnam Dep. at 76. Putnam's testimony before the State Ethics Commission came one week after Vasapolli, who was then Town Manager, interviewed him for the position of temporary police chief. Pl.'s Statement of Facts ¶ 11. Putnam testified truthfully before the Ethics Commission about the Kelleher incident, including his exchanges with Chief Felix. Compl. ¶ 23. Four days after Putnam's testimony, Vasapolli informed him that he had been passed over for the position.[3] *Id.* ¶ 37

The Ethics Commission investigation of the Kelleher incident resulted in a letter of reprimand being issued to former Town Manager Angelo[4] and the imposition of civil penalties of $2,000 each on Chief Felix and Selectman Kelleher for violations of State Conflict of Interest laws. Pl.'s Statement of Facts ¶ 12. The Commission released its findings on June 25, 2003, one week before Bisignani, who by then was Town Manager, bypassed Putnam for the position of permanent police chief.[5] *Id.*

---

**3.** Putnam's pursuit of the temporary police chief position is discussed in greater detail below.

**4.** Town Manager Angelo was reprimanded for his participation in the Kelleher incident because on that night, Angelo contacted Felix and attempted to secure preferential treatment for Kelleher. Pl.'s Statement of Facts,

Ex. 10, Letter from Peter Sturges, Executive Director, State Ethics Commission to Steven Angelo of 6/25/03 at 1.

**5.** Putnam's pursuit of the position of permanent police chief is discussed in greater detail below.

### 3. Bypass of Putnam for Temporary Police Chief Position

#### a. Letter From Putnam's Attorney to Vasapolli

In October 2002, it became clear Chief Felix would be retiring. Pl.'s Statement of Facts ¶ 13. On October 11, 2002 Putnam's attorney wrote to Town Manager Vasapolli, expressing his concern that Putnam's involvement in the Kelleher incident would be an impediment to his appointment as chief.[6] Pl.'s Statement of Facts, Ex. 14, Letter from Attorney Lichten to Vasapolli of 10/11/02 ("Lichten Letter") at 2. The letter noted that Putnam was currently number one on the Civil Service list, having achieved a significantly higher score than the next ranking individual on the list. Id. at 1.

The letter went on to state that "there have been numerous rumors that Lt. McKay [sic] may be named acting chief, and that the town will then bypass Lt. Putnam." Id. The letter stated that if Putnam was bypassed, "there could be significant legal ramifications." Id. The specific concerns noted in the letter were (1) that Putnam and Chief Felix had argued about whether or not to provide special treatment to Selectmen Kelleher; (2) that Putnam had been questioned by officials from the State Ethics Commission in relation to the Kelleher incident; and (3) that Putnam wrote a police report which criticized town officials. Id. at 1–2. The letter also raised concerns about Town Manager Vasapolli's "significant involvement" in the Kelleher incident because of his position of Town Counsel at the time of the incident. Id. at 2.

Thus, the letter asserted, Putnam was concerned that "his refusal to go along with town officials in th[e Kelleher] matter, and his subsequent cooperation with the Ethics Commission" could adversely affect his promotion. Id. Accordingly, the letter proposed that "in order to avoid the appearance of conflict, or to avoid legal challenges," the Town utilize an independent, outside panel to select a new police chief. Id.

Vasapolli responded to Putnam's counsel with a letter of his own. Pl.'s Statement of Facts, Ex. 15, Letter from Vasapolli to Lichten of 10/28/02 ("Vasapolli Letter"). Vasapolli's letter noted that the position of chief had not yet become vacant and that he had not even seen the Civil Service list. Id. at 1. The letter also stated that Vasapolli did not, in fact, have significant involvement in the Kelleher incident as "some, if not all of the individuals involved, had their own legal counsel." Id. Vasapolli indicated his resentment of the fact that Putnam's counsel was "attempting to control the legal process for the Town to fill a vacancy that does not even exist at the present time." Id. Vasapolli added that the process followed in filling any vacancy in the chief's position would be "fair and in accordance with all Civil Service rules and regulations." Id.

#### b. Vasapolli's Interview of Putnam

While serving as Town Manager, Angelo had numerous conversations with Putnam about the position of police chief. Putnam Dep. at 23–24. In 1998, Angelo informed Putnam, who had scored first on the Civil Service examination, that he was appointing Felix to the position of permanent chief but that Felix would only hold the

---

6. That attorney is not Putnam's present counsel. According to Putnam, he retained an attorney in this matter because Vasapolli "is very close professionally and personally with persons who were affected by the Ethics Committee [sic] investigation namely, Mr. Angelo and Mr. Kelleher." Putnam Dep. at 87.

position for three years. *Id.* at 24. After that point, Angelo explained, Putnam would be appointed to the position. *Id.* In exchange, Angelo requested that Putnam "not to file a bypass or make any problems." *Id.* Putnam did not oppose Felix's appointment. *Id.* at 25.

In December 2002, Chief Felix took leave from his position due to a service connected injury and applied for disability retirement. Defs.' Statement of Facts ¶ 45. Because Felix had not filed papers for final retirement, the position that became available was only temporary. *Id.* In preparation for his appointment of a temporary chief, Vasapolli sent letters to the top three candidates on the Civil Service list encouraging them to schedule an interview for the position. *Id.* at ¶ 46. Those candidates were Putman, Lieutenant James MacKay ("MacKay"), and Lieutenant Dominic DiMella ("DiMella"). *Id.* at ¶ 47.

Putnam was interviewed by Vasapolli for the position on December 9, 2002, one week before his testimony before the State Ethics Commission. Pl.'s Statement of Facts ¶ 14. The interview was dominated by questions about the Kelleher incident. *Id.* Vasapolli first asked Putnam about what problems he perceived in the department. *Id.* Following Putnam's response, Vasapolli said, "Let's talk about the Kelleher incident." *Id.* Vasapolli asked a series of questions, all based on the Kelleher incident, trying, in Putnam's mind, to get him to say that "there was nothing inappropriate that happened" on the night of the incident. Putnam Dep. at 95.

In reference to the on-scene officers' decision to drive Kelleher home rather than arresting him, Vasapolli repeatedly asked, "Don't officers have discretion to do this," and "Aren't they allowed to do that." *Id.* Putnam replied that the decision was an "inappropriate use of discretion because it was done based on [Kelleher's] position as a selectman." *Id.* Vasapolli continued to question Putnam about the Kelleher incident for the next twenty minutes. *Id.* at 96.

Vasapolli next asked Putnam about his relationship with former Town Manager Angelo. *Id.* at 98. Putnam responded that their relationship was "pretty good" but that Angelo felt that he, Putnam, did not know how to have a good time in life. *Id.* According to Putnam, Angelo's impression stemmed from Putnam's refusal "to go to nightclubs and strip clubs with Angelo and some selectmen." *Id.* at 100. When Putnam explained to Vasapolli that he declined such invitations because, "hav[ing] a wife and daughter at home" he found them inappropriate, Vasapolli rolled his eyes and said, "I have had to be their designated driver." *Id.;* Pl.'s Statement of Facts ¶ 14.

Vasapolli asked the same questions to all three candidates for the temporary chief position. Vaspolli Dep. at 67–68. According to Vasapolli, he focused on the Kelleher incident because he thought it was a very significant issue in the town and because he was unhappy with the way Chief Felix handled it. *Id.* at 68. Vasapolli claims he found Putnam's responses to questions about the Kelleher incident to be the best of the three candidates.[7] *Id.* at 70. Vasapolli viewed Putnam's education,

---

7. Putnam's response was that regardless of the identity of the person involved or their position, he would have treated them the same way. *Id.* at 70–71. Both MacKay and DiMella equivocated that their handling of the incident would "depend on the situation" and that "they would have had to have been there" to know how they would handle it. *Id.* at 70. MacKay responded further he would not have tried to influence the decision of the officers on the scene. *Id.*

leadership skills, and honesty as his strengths and his lack of experience in the Executive Officer/Acting Chief position as a weakness.[8] *Id.* at 73.

### c. Vaspolli's Selection of Lieutenant MacKay for Temporary Chief Position

Ultimately, Vasapolli selected Lieutenant MacKay for the position of temporary chief. *Id.* at 71. MacKay scored an 82 on his Civil Service examination (six points lower than Putnam's score of 88) and had earned a two year Associate's degree from North Shore Community College in 1975. Pl.'s Statement of Facts ¶ 1. The official reason Vasapolli provided for his choice of MacKay was MacKay's superior experience which included serving as Executive Officer/Acting Chief since 1995. Vasapolli Dep. at 71–72. Vasapolli also expressed his desire to maintain the status quo, since MacKay had acted as chief on several occasions in the past. *Id.* at 72. Putnam was notified on December 20, 2002 that he had not been selected for the position, four days after his testimony before the State Ethics Commission. Defs.' Statement of Facts ¶ 60; Compl. ¶ 37.

### d. Vasapolli's Conversations with Officer Michael McGrath and Selectmen Cogliano and Kelleher

Five days before Vasapolli interviewed Putnam, he discussed the candidates with Saugus Police Officer Michael McGrath ("McGrath"). Pl's Statement of Facts ¶ 8. During their conversation Vasapolli asked for McGrath's opinion on MacKay's and DiMella's qualifications for the position of temporary chief. Pl.'s Statement of Facts, Ex. 9, Aff. of Michael McGrath ("McGrath Aff.") ¶ 4. Although not asked about Put-

nam, McGrath responded that he believed Putnam to be the best candidate because Putnam "has the respect of *all* the men." *Id.* (emphasis in original). McGrath then asked, "Why are you asking me for my opinion, everyone knows that you have already made your mind up on MacKay?" *Id.* Vasapolli, without denying McGrath's assertion, replied that he had "a problem" with Putnam. *Id.* at ¶ 5.

Vasapolli noted that he disapproved of the way Putnam handled the Kelleher incident. *Id.* Vasapolli stated further, "The thing I don't like about Dave [Putnam] is that he wrote the report about Eddie Felix. Once you write down something like that it becomes a document. If I have a problem like that, I go to a man face to face." *Id.* at ¶ 6. Vasapolli added that, "the Chief shouldn't have stepped on Putnam's toes." *Id.* at ¶ 7.

Vasapolli denied speaking with any members of the Board of Selectmen about the three candidates, including Selectman Cogliano. Vasapolli Dep. at 65. Cogliano, however, claims that he and Vasapolli did speak about the candidates at some point. Pl.'s Statement of Facts ¶ 15; Cogliano Dep. at 32–33. Additionally, it appears that Vasapolli may have also spoken to Selectman Kelleher about the candidates. Pl.'s Statement of Facts ¶ 15. On January 11, 2003, Kelleher approached Saugus Police Lieutenant Thomas Coogan and said, "I hope Dave Putnam doesn't think that I have prevented him from getting the Chief's job. They asked me about it and I stated that they were all equally qualified. Please let him know." Pl.'s Statement of Facts, Ex. 8, Aff. of Thomas A. Coogan ("Coogan Aff.") ¶ 3.

---

8. The Executive Officer/Acting Chief assumes the role of chief when the chief is on vacation or out sick. *Id.*

#### 4. Bypass of Putnam for Permanent Police Chief Position

Andrew Bisignani ("Bisignani") was hired as Saugus Town Manager by the Board of Selectmen in January 2003. Pl.'s Statement of Facts ¶ 17. Bisignani was aware of both Selectman Cogliano's heated relationship with the Saugus Police Department and the Kelleher incident. Bisignani Dep. at 16–17, 34–36. Bisignani was also aware of Putnam's participation in the State Ethics Commission's investigation of the Kelleher incident which he had discussed with people in Saugus. *Id.* at 19. After Chief Felix officially retired, Bisignani began the process of selecting a permanent replacement. Pl.'s Statement of Facts ¶ 17.

##### a. Letters From Putnam's Attorney to Bisignani

On May 15, 2003, prior to scheduling any interviews for the position, Bisignani received a letter from Putnam's attorney expressing concern that Putnam would not have a fair interview because of his involvement in both the ethics proceedings against Selectman Kelleher and the liquor law charge brought against Selectman Cogliano described above. Defs.' Statement of Facts, Ex. Q, Letter from Lichten to Bisignani of 5/15/03 ("Licthen Letter II") at 1. In the letter, Putnam's counsel requested that an outside panel of police chiefs select the new permanent police chief. *Id.*

On May 23, 2003, Bisignani responded to Putnam's counsel with a letter stating that he, the Town Manager, is the appointing authority and therefore he would be making the appointment for police chief. Defs.' Statement of Facts, Ex. R, Letter from Bisignani to Lichten of 5/23/03 ("Bisignani Letter") at 1. Bisignani, however, did act on Putnam's counsel's recommendation to use experts to assist him in the interview process because he agreed that a Town Manager who does not have experience with police duties should seek expert advice. Bisignani Dep. at 43–44. Accordingly, Bisignani asked two retired police chiefs, James Russo ("Russo") of Revere, Massachusetts and John Toomey ("Toomey") of Swampscott, Massachusetts to assist him with the interview process. Defs.' Statement of Facts ¶ 72. Specifically, Bisignani asked for their assistance in formulating questions and for their advice and opinions on candidates' responses. *Id.* The only candidate that both Russo and Toomey knew personally was MacKay. *Id.* at ¶¶ 73, 75. Neither Russo nor Toomey knew the other two candidates Putnam and DiMella. *Id.*

On May 30, 2003, Bisignani informed Putnam, who remained first on the Civil Service list, that he was arranging interviews for the appointment of permanent Police Chief and that his interview was scheduled for June 4, 2003. *Id.* at ¶ 63. Two days before that interview, on June 2, 2003, Bisignani received another letter from Putnam's counsel. *Id.* at ¶ 67. This letter stated that, "unless our proposal for an independent selection panel is followed, there will undoubtedly be a new case arising out of the permanent chief's selection. In addition, as you may or may not know, David Putnam has retained a prominent civil rights attorney to bring a lawsuit against the Town for violation of the First Amendment and public policy arising out of the same fact pattern." *Id.*

##### b. Bisignani's Interview of Putnam

Bisignani prepared for his interviews by reviewing the Civil Service list, researching the individual candidates' backgrounds, discussing the interview process with Vasapolli (who had returned to his role as Town Counsel), and reviewing the Town Charter. Bisignani Dep. at 10–11. Bisig-

nani claims that when he researched the candidates' backgrounds, he received negative feedback about Putnam from "an assistant clerk in the Lynn District Court" and Fred Riley, a former prosecutor. *Id.* at 21–22.

Bisignani's interview posed several hypothetical questions. Pl.'s Statement of Facts ¶ 20(a). Bisignani asked Putnam questions about a situation in which a "businessman or politician" complained to Bisignani of harassment by the police. *Id.* At the time of the interview, the only "businessman or politician" who complained to Bisignani about police harassment was Selectman Cogliano. Bisignani Dep. at 36.

In response to Bisignani's hypothetical, Putnam responded that he would tell Bisignani to "send him over to speak with me." Putnam Dep. at 147–48. Bisignani was visibly angered with Putnam's answer and "practically yelled," "Well, they didn't come see you, they came to see me. Now what are you going to do?" *Id.* at 148. After responding that he would interview the complaining person and possibly conduct an investigation, Putnam informed Bisignani that "frequently people make charges that the police are harassing them. That's because they have been caught doing something wrong and caught red handed so they can't dispute the evidence so they will impugn the officer's motives." *Id.* at 149. Putnam suggested that Bisignani take Cogliano's complaint "with a grain of salt" until a full investigation was conducted. *Id.* Bisignani said nothing in response to Putnam's statement and simply "glared" at him. *Id.* at 149–150.

Bisignani next asked Putnam about his vision for the Police Department. *Id.* Putnam responded that he felt there was a need to "flatten" the department, that it had become "top heavy with brass" and that he wanted to see the patrol force built up. *Id.* Putnam stated his belief that officers too often referred matters to specialized units such as the domestic violence and juvenile units, rather than dealing with the problems themselves. *Id.* at 150–51. He suggested that division commanders review such referrals before they are made. *Id.* at 151. Later in the interview when Bisignani asked Putnam if he wanted to eliminate specialty positions, Putnam clarified his position by explaining that he did not want to eliminate specialty positions but merely thought such positions were being overused. *Id.* at 152–53.

During the interview, Putnam was asked by Russo about a hypothetical situation in which he witnessed misconduct by an officer who was also a personal friend. *Id.* at 153–54. Putnam replied that he would take the appropriate disciplinary action, including termination or prosecution if appropriate. *Id.* at 153. Putnam was also asked by Toomey, "What if you had a politician or businessman in the community who had been very supportive of the police and made a lot of donations, had been very supportive of you during budget time, and his son or daughter got a ticket or got arrested for drunk driving? Would you help him?" [9] *Id.* at 154.

When Putnam responded that he would not, Toomey asked, "Why not? These people have been good to you." *Id.* at 154–55. Putnam responded, "If I am chief of the Police Department, this police department, there is going to be no interfering in prosecutions for any matter whether it's a criminal matter, civil matter, moving violation. That is the court's job to decide

---

9. Bisignani acknowledged, that as far as he knew, the only Saugus politicians who had recently been arrested or involved in a drunk driving matter were Selectmen Cogliano and Kelleher. Bisignani Dep. at 37.

how those things should be resolved. We are not going to do it based on politics or friendships." *Id.* at 155. No one in the interview verbally responded to Putnam's response, however, Toomey looked at Russo and according to Putnam, "gave him a look like I was the biggest fool in the world." *Id.*

After the interviews, Russo expressed his opinion that DiMella had a bright future but lacked experience. Defs.' Statement of Facts ¶ 74. Russo also stated that Putnam was academically qualified but lacked administrative experience and that he was concerned about Putnam's idea to eliminate specialized units, although Putnam steadfastly maintains that he did not express this idea. *Id.* Russo also expressed his opinion that MacKay had strong administrative experience, especially on budgetary issues. *Id.*

On July 2, 2003, Bisignani informed Putnam that he had not been selected for the police chief position. *Id.* at 12. On the same day, Bisignani appointed MacKay to the position. *Id.* In his appointment letter to the State Human Resources Division ("HRD") explaining why he was passing over Putnam, the top-ranked person on the Civil Service list, Bisignani cited MacKay's personality, experience, and shared vision for the Police Department. *Id.;* Pl.'s Statement of Facts, Ex. 16, Letter from Bisignani to Commonwealth of Massachusetts, Human Resources Division of 7/2/03 ("Bisignani Letter to HRD") at 1–2. On July 18, 2003, the HRD approved the bypass of Putnam based on the reasons in Bisignani's letter. Defs.' Statement of Facts, Ex. X, Letter from HRD to David Putnam of 7/18/03.

In contrast to what he viewed as MacKay's common vision for the Police Department, Bisignani stated that Putnam did not share his vision, which involved expanding the use of specialized operations. Bisignani Letter to HRD at 3. Putnam, Bisignani asserted, "wants to 'flatten' the Department by placing the most emphasis on police patrol and downgrading the special units." *Id.*

### c. Conversations Between Bisignani and Vasapolli Regarding Candidates

Vasapolli denies discussing any of the candidates with Bisignani. Vasapolli Dep. at 78–79. Specifically, Vasapolli denies saying anything to Bisignani about MacKay. *Id.* at 79–80. Bisignani stated in his deposition testimony, however, that he and Vasapolli did have a conversation about MacKay. Bisignani Dep. at 15. According to Bisignani, he asked Vasapolli why he had not been the one to appoint a permanent chief. *Id.* at 14. Vasapolli responded that because Chief Felix had not yet officially retired when he appointed MacKay, that position was only temporary. *Id.* at 14–15. Vasapolli then stated that MacKay had been a "natural fit" for the position. *Id.* at 15. In contrast to Vasapolli's endorsement of MacKay, he said nothing to Bisignani about Putnam. *Id.* at 15–16.

### 5. MacKay's Actions as Permanent Chief

### a. "Flattening Out" of Command Structure

After becoming Permanent Chief, MacKay eliminated a number of lieutenant positions, a change MacKay claims to have favored. Pl.'s Statement of Facts, Ex. 4, Dep. of Chief James J. MacKay ("MacKay Dep.") at 51. MacKay admits that this change could be described as "flattening out the command structure." *Id.* at 51–52. Bisignani never complained to MacKay about the elimination of these positions. *Id.* at 53. Additionally, MacKay stated that because of budget restrictions, he had

reduced the number of officers in specialty units after becoming Permanent Chief. *Id.* at 57.

### b. Selectman Cogliano Photograph Incident

After becoming Permanent Chief, MacKay refused to permit Lieutenant DiMella, the head of the detective unit, to refer an investigation of Selectman Cogliano to the State Ethics Commission. Pl.'s Statement of Facts Ex. 6, Aff. of Domenic DiMella ("DiMella Aff.") ¶ 5. DiMella had been working with the Essex County District Attorney's Office to investigate violence at Saugus nightclubs, including clubs owned or managed by Cogliano. *Id.* at ¶¶ 3–4.

At a Board of Selectmen Meeting convened to address nightclub violence and the passage of a bylaw forbidding nightclubs from operating after 2:00 a.m., Cogliano claimed that he was not affiliated with "Caruso's Diplomat" ("Caruso's"), one of the clubs under investigation. *Id.* at ¶ 4. Cogliano, therefore, refused to recuse himself from the Board's rulings on nightclub issues. *Id.* DiMella developed evidence showing that Cogliano was in fact affiliated with Caruso's. *Id.* The Essex County District Attorney instructed DiMella to refer Cogliano to the State Ethics Commission. *Id.* at ¶ 6. When DiMella informed MacKay of his plan to do so, MacKay ordered DiMella not to, claiming that he needed Cogliano's support for a tax override. *Id.* at ¶ 5.

Another Saugus police officer, Stephen McCarthy ("McCarthy") who was upset that Cogliano denied being affiliated with Caruso's, photographed Cogliano working there. *Id.* at ¶¶ 8–9. Following this incident, MacKay called DiMella into his office and angrily questioned him about whether he had sent McCarthy to photograph Cogliano. *Id.* at ¶ 9. MacKay said that Cogliano had just telephoned him and was

"screaming" about the incident. *Id.* MacKay also mentioned that Town Manager Bisignani wanted to see him [MacKay] regarding the incident. *Id.* MacKay told DiMella that he wanted McCarthy punished. *Id.* at ¶ 10. When DiMella explained to MacKay that it was not against the law to photograph a person in public, MacKay told DiMella to "have a talk" with McCarthy. *Id.*

The following day, MacKay told DiMella that he had been called to Town Manager Bisignani's office, where he met with Bisignani and Town Counsel Vasapolli. *Id.* at ¶ 11. MacKay told DiMella that they demanded to know why Cogliano was being investigated and "grilled him" about the incident. *Id.* MacKay stated that he did not reveal anything about the District Attorney's investigation of Caruso's and that he informed them that McCarthy had not done anything illegal. *Id.* Finally, MacKay stated, "They were not very happy with me at Town Hall." *Id.*

McCarthy made an entry in the official police log about observing Cogliano at Caruso's and taking photographs of him there. Pl.'s Statement of Facts, Ex. 17, Saugus Police Department Log Entry Oct. 22, 2003. DiMella informed MacKay about the log entry. DiMella Aff. at ¶ 12. The following day, DiMella examined the police log and observed that the entry concerning Cogliano had been deleted. *Id.* MacKay denies that he deleted the log. MacKay Dep. at 39–40. MacKay acknowledges that only he and one other person in the department have the authority to delete a log entry. *Id.* at 41–42. While MacKay acknowledges that he discussed the Cogliano incident with Bisignani and Vasapolli, he asserted the attorney-client privilege when asked to discuss the conversation. *Id.* at 44–47.

### c. No Confidence Vote

In February or March of 2004, the Saugus Police Superior Officers Union voted that they had no confidence in MacKay as police chief. Putnam Dep. at 178. MacKay sent a letter to the Board of Selectmen reviewing the reasons for the vote. MacKay Dep. at 90. In the letter MacKay stated that a reporter for the newspaper which had printed an article about the vote, told him that Putnam was the source of confidential police information related to the vote. *Id.* At his deposition, MacKay was shown a letter addressed to him from that reporter denying that she had ever told MacKay that she had spoken with Putnam or that Putnam was her source. *Id.* at 91. The letter further denied that Putnam was, in fact, her source. *Id.* On relevancy grounds, MacKay refused to answer questions at his deposition as to whether the reporter had actually told him that Putnam was her source. *Id.* at 91–99.

## I. DISCUSSION

### A. Standard of Review

Summary judgment is warranted if, after reviewing the facts in the light most favorable to the non-moving party, no genuine issues of material fact remain and that the moving party is entitled to judgment as matter of law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; Fed.R.Civ.P. 56(c). A "genuine" issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of either party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A fact is material when it "might affect the outcome of the suit under the governing law." *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 90 (1st Cir.1993) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

In making its determination, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. The movant has the initial burden of production, which it can meet either by offering evidence to disprove an element of the plaintiff's case or by demonstrating an "absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met its burden, the non-moving party must "go beyond the pleadings, and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a material issue for trial." *Id.* at 323, 106 S.Ct. 2548 (internal quotation marks omitted).

Defendants Vasapolli and Bisignani have moved for summary judgment of Putnam's 42 U.S.C. § 1983 claim that they violated Putnam's right of freedom of speech as protected by the First and Fourteenth Amendments on the following grounds: (1) Putnam has failed to establish that he engaged in First Amendment protected activity; (2) Putnam has failed to establish a causal link between First Amendment protected activity and adverse employment action; and (3) Vasapolli and Bisignani are entitled to qualified immunity. Defs.' Mem. at 3, 6, 14.

Defendant Town of Saugus ("Town") has also moved for summary judgment of Putnam's First Amendment section 1983 claim on the ground that Putnam has failed to adduce evidence of an unconstitutional custom or policy or that either Vasapolli or Bisignani committed an underlying constitutional violation. Def. Town of Saugus' Mem. in Supp. of Mot. for Summ. J. ("Town's Mem.") at 13. Additionally, the Town moves for summary judgment of Putnam's retaliation claim under Mass. Gen. Laws ch. 149, § 185 on the ground

that he has produced no evidence of retaliation. *Id.* at 4.

### B. Putnam's Section 1983 Claims Against Vasapolli and Bisignani

Section 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ....

42 U.S.C. § 1983.

In his complaint, Putnam claims that both his testimony before the State Ethics Commission and his written report in relation to the Kelleher incident constituted speech protected by the First and Fourteenth Amendments to the United States Constitution. Compl. ¶ 49. Putnam maintains that Vasapolli and Bisignani passed him over for the positions of temporary and permanent chief respectively because of that speech. *Id.* at ¶ 50. Because Vasapolli and Bisignani acted under color of state law in their conduct, Putnam argues, their actions infringed on his right to freedom of speech protected by the First and Fourteenth Amendments, in violation of section 1983. *Id.* ¶¶ 51–52.

#### 1. First Amendment Protected Activity

■ The First Amendment to the United States Constitution protects citizens' freedom of speech. U.S. Const. amend. I. A public employee does not relinquish her First Amendment rights to comment on matters of public concern simply by virtue of her government employment. *Connick v. Myers*, 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (citing *Pickering v.*

*Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). Absolute First Amendment protection, however, is not accorded to all public employees' speech irrespective of its content. *Tang v. State of R.I. Dep't of Elderly Affairs*, 163 F.3d 7, 11 (1st Cir.1998). Otherwise, anything said by a public employee on the job could "plant the seeds of a constitutional case." *Id.* (quoting *Connick*, 461 U.S. at 149, 103 S.Ct. 1684). Instead, courts employ a three part test to determine whether an actionable First Amendment claim exists. *Id.* at 12; *Mihos v. Swift*, 358 F.3d 91, 102 (1st Cir.2004).

First, a court must determine whether the employee made her comments "as a citizen upon matters of public concern." *Tang*, 163 F.3d at 12 (quotation omitted). If the speech involved addresses only issues of personal interest rather than public concern, a First Amendment claim cannot survive absent "the most unusual circumstances" because "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.* (quoting *Connick*, 461 U.S. at 147, 103 S.Ct. 1684).

Second, courts must weigh the strength of the employee's and the public's First Amendment interests against the government's interest in the efficient administration of the workplace. *Mullin v. Town of Fairhaven*, 284 F.3d 31, 37–38 (1st Cir. 2002); *Tang*, 163 F.3d at 12 (citing *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731). Third, if the employee's and the public's interests outweigh a legitimate government interest in restricting the employee's speech, the employee must show that the protected speech was a substantial or motivating factor in the adverse employment action. *Mihos*, 358 F.3d at 102 (citations omitted); *Tang*, 163 F.3d at 12 (citing *O'Connor v. Steeves*, 994 F.2d 905, 913 (1st Cir.1993)).

### a. Public Concern Requirement

█ Whether an employee's speech addresses a matter of public concern as opposed to her private interest is determined by "the content, form, and context" of the given statements "as revealed by the whole record." *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684. Speech touches upon a matter of public concern if it can be "fairly considered as relating to any matter of political, social or other concern to the community." *Id.* at 146, 103 S.Ct. 1684. According to Putnam, his speech at issue includes (1) his protests in his conversation with Chief Felix regarding Felix's request that Selectman Kelleher receive preferential treatment; (2) Putnam's report on the Kelleher incident; (3) Putnam's discussions with and testimony before the State Ethics Commission; and (4) as concerns Bisignani's hiring decision, Putnam's order that officers charge Selectman Cogliano with a criminal liquor law violation. Pl.'s Mem. at 12.

According to Putnam, the allegation that a police department improperly accorded favorable treatment to political figures is clearly a matter of public concern. *Id.* at 13. The State Ethics Commission's investigation of the Kelleher incident, Putnam argues, is conclusive proof that the public was concerned about what Putnam disclosed. *Id.* Additionally, Putnam observes, Vasapolli himself testified that the Kelleher incident and Putnam's report on it were the talk of the town. *Id.;* Vasapolli Dep. at 17, 39.

Regarding Putnam's testimony before the State Ethics Commission, Vasapolli and Bisignani argue that Putnam was not engaged in constitutionally protected speech because there had already been extensive media reports on the Kelleher incident at the time of Putnam's testimony. Defs.' Mem. at 4. Therefore, Putnam "was not bringing to light any information that had not already been made public." *Id.* (citing *Coyne v. City of Somerville,* 770 F.Supp. 740, 752 (D.Mass.1991) (Cohen, M.J.) (noting that the plaintiff could not be considered a citizen going public for the first time when there had already been wide scale press coverage of a matter)).

There is no legal requirement, however, that an individual's speech bring to light new, previously non-public information in order for it address a matter of public concern. *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684; *Tang,* 163 F.3d at 12. In *Coyne v. City of Somerville,* the court examined prior media coverage as one factor in the overall context in which the speech was made to help determine whether the speaker's interest was merely personal. *Coyne,* 770 F.Supp. at 752. The court did not announce a rule that testimony regarding matters which have received extensive press coverage fall outside the realm of public concern. *See id.*

It can hardly be argued that media coverage of the Kelleher incident transforms Putnam's testimony before a *public* body investigating misconduct by *public* officials into a matter only of *private* interest. *See Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684 (emphasis added). If such were the case then virtually all testimony given before a court or other public body would fall outside the realm of protected First Amendment speech so long as the events surrounding the trial or hearing were widely publicized. Surely, this cannot be so. *See Konits v. Valley Stream Cent. High Sch.,* 394 F.3d 121, 126 (2d Cir.2005) (citing *Mandell v. County of Suffolk,* 316 F.3d 368, 383 (2d Cir.2003)) (noting that speech is of particular public concern when it involves actual testimony in court or in administrative proceedings); *Scrima v. Gay,* 322 F.Supp.2d 49, 51 (D.Mass.2004) (Zobel, J.) (holding that a public employee's deposition testimony involves a matter

of public concern if "arguably a statement about misconduct or corruption in [c]ity government" and regardless of whether testimony is given in employee's official capacity) (citation omitted).

Moreover, the law is quite clear that speech like Putnam's report and testimony relating to the possible corruption of public officials addresses a matter of public concern. *Rivera–Jimenez v. Pierluisi,* 362 F.3d 87, 94 (1st Cir.2004) (holding that law enforcement agent's speech which raised the possibility of corruption in a public agency is protected under the First Amendment); *Guilloty Perez v. Pierluisi,* 339 F.3d 43, 53 (1st Cir.2003) (holding that law enforcement officer's First Amendment interest is entitled to even greater weight where officer's reports exposed possible government corruption); *O'Connor,* 994 F.2d at 915 (quoting *Connick,* 461 U.S. at 145 n. 7, 103 S.Ct. 1684) (holding that an employee's speech which concerns the alleged abuse of public office occupies "the highest rung of the hierarchy of First Amendment values"); *Wagner v. City of Holyoke,* 241 F.Supp.2d 78, 91 (D.Mass. 2003) (Ponsor, J.) (holding that statements comprising evidence of possible corruption within a police department "are precisely the type of communications that demand strong First Amendment protection").

Vasapolli and Bisignani argue, however, that to the extent Putnam's First Amendment claim is derived from his police report of the Kelleher incident, such speech is not protected in the context of public employment. Defs.' Mem. at 4. In support of their argument they cite *Tang v. State of Rhode Island, Dep't of Elderly Affairs* which ruled that an employee's personal complaints about her working conditions did not constitute a matter of public concern. *Tang,* 163 F.3d at 12–13.

In *Tang,* the working conditions complained of included *inter alia* being placed on administrative leave and being relocated within the building. *Id.* at 12 .n. 5. There is a First Amendment distinction, however, between complaints about these types of working conditions, which are not protected and complaints about fellow employees' official misconduct, which are protected. *Guilloty Perez,* 339 F.3d at 52 (holding that law enforcement agent's internal reports of misconduct by fellow officers involved matters of public concern and contrasting such speech with employee's complaints in *Tang* ) (citation omitted); *Torres–Rosado v. Rotger–Sabat,* 335 F.3d 1, 11–12 n. 10 (1st Cir.2003) (holding that a public employee's internal memoranda raising concerns about public corruption are protected First Amendment speech because they addressed a matter of public concern); *O'Connor,* 994 F.2d at 916 (citing *Givhan v. Western Line Consol. Sch. Dist.* 439 U.S. 410, 415–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) for the proposition that First Amendment protection is not lost where an employee discloses official misconduct directly to employer rather than to the public); *see also Taylor v. Keith,* 338 F.3d 639, 643–46 (6th Cir.2003) (holding that police reports raising allegations of misconduct by other officers touched upon a matter of public concern even if drafted within the scope of employment and not disclosed to the media). Therefore, Vasapolli and Bisignani's argument that Putnam's police report cannot be the statement of a citizen addressing a matter of public concern is unavailing.

■ The same conclusion, however, does not extend to other "speech" which Putnam claims to be protected by the First Amendment. Specifically, Putnam's "order" that officers charge Selectman Cogliano with a liquor law violation is not protected First Amendment speech because it was issued in the normal course of his duties and fails to address a matter of

public concern such as official misconduct. While information relating to Cogliano's liquor law violation could be considered information of "general public interest," that fact alone does not make it of "public concern" for First Amendment purposes. *Morris v. Crow*, 142 F.3d 1379, 1381–82 (11th Cir.1998) (citing *Connick*, 461 U.S. at 148 n. 8, 103 S.Ct. 1684).

In *Morris v. Crow*, the Eleventh Circuit Court of Appeals held that an accident investigator's report on the traffic accident of a fellow Sheriff's Department employee did not involve a matter of public concern even though the report addressed negligent conduct that jeopardized public safety. *Id.* at 1381. Although the report reflected information of "general public interest" it was not intended to address a matter of "public concern" for First Amendment purposes as it was *mandatorily* written in the normal course of the investigator's duties. *Id.* at 1382 (emphasis added).

The court contrasted such speech with a *voluntarily* written police report bringing to light the official misconduct of fellow officers. *Id.* (citations omitted) (emphasis added). Such speech, the court ruled, is not in the *normal* course of an officer's duties because its purpose is to raise issues of public concern, namely official misconduct. *Id.* (emphasis added); *Scrima*, 322 F.Supp.2d at 51 (citing *Morris*, 142 F.3d at 1382 for the proposition that there is a First Amendment distinction between speech related to the normal course of an employee's duties and speech which reports specific wrongs and abuses within city government). The report in *Morris* was within the normal course of the investigator's duties because there was no evidence indicating that his purpose included the exposure of official misconduct. *Morris*, 142 F.3d at 1382.

Unlike Putnam's report on the Kelleher incident which he drafted because of the public's concern over the incident, *See* Putnam Dep. at 34; Pl.'s Mem. at 19, and which specifically addressed instances of official misconduct, there is no indication that Putnam intended to address a matter of public concern by ordering Cogliano to be charged with a liquor law violation. *Id.* at 130, 149. Rather, Putnam ordered Cogliano to be charged because Cogliano had broken the law. *Id.* Such an order is presumably within the normal course of a police officer's duties and Putnam makes no claim that it was issued for any reason other than because it was part of his job to do so. *See id.* Cogliano's position as a selectman does not convert Putnam's order into a matter of public concern as the charge against him was not tied to any official misconduct attendant to his position as Selectman. Rather, the charge stemmed from Cogliano's capacity as a nightclub operator. *Id.* at 129–30. Thus, Putnam's order cannot be considered protected First Amendment speech because it did not address a matter of public concern. *Connick*, 461 U.S. at 147, 103 S.Ct. 1684.

■ Similarly, Vasapolli and Bisignani argue that Putnam drafted his report of the Kelleher incident not to address a matter of public concern but rather to advance his personal interests including becoming Chief of Police. Defs.' Mem. at 5; *see also Mullin*, 284 F.3d at 38–39 (observing that motive is relevant in determining whether an issue raised by a government employee is of public concern). They support this argument by citing Putnam's inclusion in the report of his heated exchange with Felix in which Putnam stated, "I don't go around starting trouble like you used to." Defs.' Mem. at 5. This, they argue, combined with the timing of the report, demonstrates that Putnam filed the report not to speak to a matter of public

concern but to address a personal grievance with Felix. *Id.* Vasapolli and Bisignani also cite Putnam's actions following his writing of the report and observe that "this suit was preordained" and became "inevitable when Putnam's counsel interfered with the appointment process by sending threatening letters to both Vasapolli and Bisignani prior to interviews ever being posted." *Id.* These letters, they argue were designed to place Putnam in a better position than other candidates. *Id.* at 6.

While Putnam's filing of the Kelleher report and subsequent actions may permit the inference that he was motivated by his own personal interest, an alternative inference is also available. Based on the record evidence, a jury could permissibly find that Putnam wrote the report because he wanted to bring to light the issue of official misconduct and because he wanted to clarify his role and the roles of Officers Vecchio and Cabral in the Kelleher incident.[10] Putnam Dep. at 34–35; Pl.'s Mem. at 19.

Additionally, a jury is entitled to believe Putnam that the letters sent by his attorney were motivated solely by his desire to receive fair consideration for the positions. Putnam Dep. at 87. Here, at the summary judgment phase, the Court must view the evidence in the light most favorable to Putnam and draw all reasonable inferences in his favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Therefore, Vasapolli's and Bisignani's argument that Putnam was not publicly motivated in his speech does not entitle them to summary judgment because Putnam's motivation is a genuine issue of material fact. *Id.;* Fed. R.Civ.P. 56(c).

### 2. Causal Link Between Protected Activity and Adverse Employment Action

■ As mentioned above, the third requirement of a valid First Amendment claim in the public employment context is that the employee show that her protected activity was a substantial or motivating factor in the adverse employment action. *Mihos,* 358 F.3d at 102 (citations omitted).[11] Once a plaintiff has made this

---

10. While Putnam's desire to clarify his involvement may be understood as a personal interest, such characterization does not remove Putnam's report from the realm of public concern as that requirement demands only that an employee not speak "upon matters *only* of personal interest...." *Connick,* 461 U.S. at 147, 103 S.Ct. 1684 (emphasis added); *O'Connor,* 994 F.2d at 915; *see also City of San Diego v. Roe,* —— U.S. ——, ——, 125 S.Ct. 521, 525, 160 L.Ed.2d 410 (2004) (citation omitted); *Guilloty Perez,* 339 F.3d at 51 (citation omitted). Furthermore, even if a jury finds that Putnam was partially motivated by a personal grievance with Felix, such motivation does not automatically cut off First Amendment protection. *Wagner,* 241 F.Supp.2d at 92 ("a plaintiff who personally dislikes, or bears a grudge against, a particular individual does not necessarily lose his right to make statements regarding that individual that raise matters of public concern, even if his motive in making the statements

derives partially or completely from personal animus").

11. The defendants do not dispute Putnam's assertion that his speech meets the second requirement of an actionable First Amendment claim, namely that his interest in disclosing Kelleher incident and the public's interest in being informed about it outweigh the Town's interest in the efficient administration of the workplace. *Mullin,* 284 F.3d at 37–38. Because the Town does not claim any legitimate interest in curtailing Putnam's speech, this Court cannot conclude as matter of law that its interest outweighs that of Putnam and the public. *O'Connor,* 994 F.2d at 916. An important part of the record supporting this conclusion is the absence of any evidence showing a disruption of police department functioning. *Wagner,* 241 F.Supp.2d at 93–94. Additionally, because the Town does not dispute the accuracy of the information disclosed by Putnam, the weight accorded to its

showing, the burden shifts to the employer to show by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected speech. *Vazquez–Valentin v. Santiago–Diaz*, 385 F.3d 23, 30 (1st Cir.2004); *O'Connor*, 994 F.2d at 912.[12] Vasapolli and Bisignani argue that Putnam has failed to meet this requirement. Defs.' Mem. at 6.

### a. Awareness of Putnam's Ethics Commission Testimony

■ First, Vasapolli argues, a causal connection between Putnam's activity and his being passed over for the position of temporary chief is lacking because Vasapolli was not even aware that Putnam had testified before the State Ethics Commission and certainly not the substance of that testimony. *Id.* at 7. Furthermore, he argues, Putnam did not testify until after his interview. *Id.* Vasapolli's alleged lack of awareness, however, is refuted by evidence in the record before the Court. The October 11, 2002 letter from Putnam's attorney to Vasapolli stated that "Lt. Putnam has been questioned by the Ethics Commission" about the Kelleher incident. Licthen Letter at 2. The letter also noted Putnam's "subsequent cooperation with the Ethics Commission" following the Kelleher incident. *Id.*

According to Vasapolli, this letter is "too vague" to provide a basis for retaliation. Defs.' Mem. at 7 n. 3. Although this letter was sent prior to Putnam's actual testimony, it placed Vasapolli on notice that Put-

nam had been approached by the Ethics Commission and that he was questioned regarding the Kelleher incident. Therefore, Vasapolli's own self-serving statement that he did not know about Putnam's testimony is insufficient to establish his lack of knowledge as matter of law. *See Rosenberg v. City of Everett*, 328 F.3d 12, 17 (1st Cir.2003). Furthermore, the fact that Putnam's testimony before the Ethics Commission came after Vasapolli's interview of Putnam is also insufficient for a grant of summary judgment on the issue of Vasapolli's knowledge because the decision to bypass Putnam for the position of temporary chief was not made until after he testified.

The inference that Vasapolli knew of Putnam's testimony is supported by the fact that Vasapolli acknowledged that the events related to the Kelleher incident were widely discussed throughout Saugus. Vasapolli Dep. at 39. In Vasapolli's words, the events surrounding the Kelleher incident were "very public" and were "discussed by anybody politically involved in the town and people not politically involved in the town." *Id.* Specifically, Vasapolli acknowledged that the Ethics Commission's investigation was widely discussed throughout Saugus. *Id.* at 52–53.

Further, Vasapolli admits he discussed the events related to the Kelleher incident with former Town Manager Angelo, a personal acquaintance and participant in the Ethics Commission's investigation who himself testified. *Id.* at 18–20. While this discussion came prior to Putnam's testimo-

---

interests may be reduced. *O'Connor*, 994 F.2d at 916 n. 8 (citation omitted).

**12.** A plaintiff does not have to produce, as Vasapolli and Bisignani contend, "significantly probative evidence" that the protected activity was a "but for" cause of the adverse employment action; she must only show that it was a "substantial or motivating *factor.*"

*Vazquez–Valentin*, 385 F.3d at 30 (emphasis added). The precedent that Vasapolli and Bisignani cite for the more stringent burden of proof did not involve a First Amendment claim but a retaliatory discharge claim under 42 U.S.C. § 215. Defs.' Mem. at 8 (citing *Kearney v. Town of Wareham*, 316 F.3d 18, 24 (1st Cir.2002)).

ny, it supports the inference that Vasapolli was apprised of the events related to the Kelleher incident, including the Ethics Commission's investigation and Putnam's testimony.[13]

Bisignani argues that he too was unaware that Putnam testified before the Ethics Commission. Defs.' Mem. at 8. Bisignani claims that he could not have been aware of Putnam's testimony before the Ethics Commission because he did not become Town Manager until after Putnam testified. Defs.' Mem. at 8. Bisignani, however, was Town Manager on June 25, 2003, the day on which the Ethics Commission released its findings on the Kelleher incident. Pl.'s Statement of Facts ¶ 12. On that date, the Commission announced that it had issued a letter of reprimand to former Town Manager Angelo and had imposed civil penalties of $2,000 each on Former Chief Felix and Selectman Kelleher. *Id.* These findings were released the week before Bisignani passed over Putnam for the position of permanent chief. *Id.*

More importantly, Bisignani specifically acknowledged in his deposition testimony that he was aware of Putnam's involvement "on the prosecution side" of Ethics Commission proceedings. Bisignani Dep. at 20. This was in direct response to a question about whether Bisignani knew that Putnam had been involved in testifying before the Commission at the time Bisignani was considering candidates for the permanent chief position. *Id.* Finally, the May 15, 2003 letter from Putnam's counsel to Bisignani listed as a reason for Putnam's concern, Putnam's involvement in the Ethics Commission's proceedings against Selectman Kelleher. Defs.' State-

ment of Facts ¶ 64. Bisignani's letter in response acknowledged his awareness that Putnam had testified before the Commission. Bisignani Letter at 1. Accordingly, a reasonable inference is available that Bisignani was aware of Putnam's Ethics Commission testimony and his lack of knowledge has not been established as matter of law.

**b. Retaliation Against Protected Activity**

██ Vasapolli and Bisignani next argue that even if they were aware of Putnam's protected activity, he cannot establish a connection between that activity and the bypasses. Defs.' Mem. at 8.

**(1) Town Manager Vasapolli**

Vasapolli argues that there is no record evidence to suggest that Putnam's report of the Kelleher incident or his Ethics Commission testimony were substantial or motivating factors in the decision to pass over him for the position of temporary chief. *Id.* Putnam, however, has cited sufficient evidence to support an inference to the contrary.

Vasapolli acknowledges that he was upset about Putnam's report of the Kelleher incident in that it included "personal statements" about Chief Felix and because it was not filed until almost two weeks after the events which it described. Vasapolli Dep. at 28. Additionally, during Vasapolli's interview of Putnam, the interview was dominated by questions about the Kelleher incident. Pl.'s Statement of Facts ¶ 20(a). Vasapolli claims that he agreed with Putnam's responses regarding his handling of the incident. Vasapolli Dep. at 70. Yet

---

13. Even if Vasapolli is to be believed that he was unaware of Putnam's testimony, he was aware of Putnam's police report on the Kelleher incident. Vasapolli Dep. at 16–17, 24. Therefore, Vasapolli's lack of awareness of Putnam's testimony would not automatically sever a causal connection between Putnam's protected activity and Vasapolli's hiring decision.

this claim is contradicted by Vasapolli's conduct during the interview. That is, while Putnam explained his belief that it was inappropriate for the on-scene officers to drive Kelleher home rather than arrest him, Vasapolli repeatedly countered, "Don't officers have discretion to do this?" and "Aren't they allowed to do that?" Putnam Dep. at 95.

Additionally, according to Officer McGrath, five days before Putnam's interview with Vasapolli, Vasapolli approached McGrath and asked his opinion on MacKay's and DiMella's qualifications for the temporary chief position. McGrath Aff. ¶ 4. When McGrath asked, "Why are you asking me for my opinion, everyone knows that you have already made your mind up on MacKay?" Vasapolli replied that he had a "problem" with Putnam and that "he did not like the way ... Putnam handled the Kelleher situation." Id. at ¶¶ 4–5. Vasapolli said that he was upset about Putnam's report on the Kelleher incident claiming, "The thing I don't like about Dave [Putnam] is that he wrote the report about Eddie Felix. Once you write down something like that it becomes a document. If I have a problem like that, I go to a man face to face." Id. at ¶ 6.

In direct response to McGrath's question about his choice for the position of temporary chief, Vasapolli stated that he had a problem with Putnam namely, that he had written a report on the Kelleher incident. The timing and substance of this response permits the inference that Putnam's report on the Kelleher incident was a "substantial or motivating factor" in the decision to bypass him for the temporary chief position. Mihos, 358 F.3d at 102.

Vasapolli's counsel argues that the sole inference that can be drawn from the record evidence is that Vasapolli was upset with Putnam's report only to the extent that it included personal statements about Chief Felix including that Felix had been a "troublemaker" in the past who used to "stir up grievances." Tr. of Mot. Hr'g of Jan. 27, 2005 ("Tr.") [Doc. No. 31] at 9–11. For this argument, Vasapolli's counsel relies on Vasapolli's own deposition testimony in which Vasapolli acknowledges as much. Id. at 9–10; Vasapolli Dep. at 57–58. Such portions of Putnam's report, counsel argues, are insufficient to support any claim in this case. Tr. at 9–10. As counsel further points out, Vasapolli testified that Putnam, in his opinion, was the only person who acted appropriately with regard to the Kelleher incident. Id. at 9; Vasapolli Dep. at 59.

The problem with this argument is that it takes Vasapolli's self-serving statements as true and fails to address the affidavit of Officer McGrath which provides direct evidence that Vasapolli claimed to have "a problem" with Putnam because he did not like the way Putnam "handled the Kelleher situation," specifically, that he "wrote the report about Eddie Felix." McGrath Aff. ¶¶ 5–6. Nothing in Vasapolli's subsequent statements to McGrath limited his dissatisfaction to the specific portions of the report referring to Felix as a troublemaker who used to stir up grievances. See id. at ¶¶ 6–7.

Accordingly, a jury could permissibly find that Vasapolli's "problem" with Putnam included not only the report's personal statements cited by his counsel but also the report's exposure of Felix's official misconduct attendant to the Kelleher incident. As discussed above, such portions of the report are sufficient to support an actionable First Amendment claim. Rivera–Jimenez, 362 F.3d at 94; Guilloty Perez, 339 F.3d at 53; O'Connor, 994 F.2d at 915 (citation omitted); Wagner, 241 F.Supp.2d at 91.

Vasapolli next argues that the same result (bypassing Putnam) would have been

obtained regardless of Putnam's engagement in First Amendment protected activity. Defs.' Mem. at 10. In support of this claim, Vasapolli argues first that Putnam's achievement of the highest Civil Service score does not entitle him to the position of chief. Defs.' Mem. at 10–11 (citing *Burns v. Sullivan*, 619 F.2d 99, 104 (1st Cir. 1980)). Next, Vasapolli argues, there existed sufficient reasons for selecting Mac-Kay rather than Putnam. *Id.* at 11. These reasons include MacKay's prior experience as Executive Officer/Acting Chief and Vasapolli's desire to maintain the status quo as MacKay was already Acting Chief at the time of his appointment. *Id.*

While a jury may believe Vasapolli's stated rationale, it does not eliminate the other possible inference that Vasapolli's decision was in retaliation for Putnam's protected speech. To be entitled to summary judgment, Vasapolli must demonstrate that no reasonable jury could find that he has not shown by a preponderance of the evidence that he would have bypassed Putnam regardless of Putnam's speech. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Vazquez–Valentin*, 385 F.3d at 30; *O'Connor*, 994 F.2d at 912. Because of the record evidence permitting the inference of Vasapolli's retaliatory motive, there is a genuine issue of material fact in this regard and summary judgment is inappropriate for the section 1983 claim against Vasapolli. *Anderson*, 447 U.S. at 254, 100 S.Ct. 2124; Fed. R. Civ. Pro. 56.

### (2) Town Manager Bisignani

■ Bisignani similarly points to the absence of sufficient evidence to establish that Putnam's protected speech was a "substantial or motivating factor" in his bypass of Putnam for the position of permanent chief. *Mihos*, 358 F.3d at 102. In response, Putnam first notes that just as his interview with Vasapolli was dominated by questions about the Kelleher incident, "his interview with Bisignani was dominated by questions about 'political influence' and drunk driving arrests, all of which, a jury could conclude, were based on the Kelleher incident." Pl.'s Mem. at 8.

Next, Putnam points out, at the time of his interview, he had recently been involved in a criminal charge being brought against Selectman Cogliano who later complained to Bisignani that Saugus police were harassing him. *Id.* at 9. During the interview, Bisignani posed a series of questions apparently based on these complaints. *Id.* Putnam argues that a jury could infer that Bisignani spent so much of the interview asking these questions out of concern that Putnam would cause "problems" for "influential businessmen and political figures, such as Cogliano, Kelleher, Felix, and Angelo." *Id.* This inference, Putnam argues, is supported by "the temper of the interview" during which Bisignani "practically yelled" at Putnam and the retired chiefs assisting him "made faces" at Putnam's responses. *Id.*

Additionally, Putnam observes that Bisignani, in his deposition testimony and in his letter to HRD explaining the bypass, placed great weight on what he perceived as a difference between his vision for the police department and Putnam's. *Id.* Bisignani claimed that Putnam wanted to eliminate special units whereas Bisignani believed such units should be expanded. Bisignani Letter to HRD at 3. Putnam claims that Bisignani's letter distorted his view which was that he wanted to closely supervise the method by which cases were referred to special units. Pl.'s Mem. at 9–10. This distortion, Putnam argues, could support a jury finding that the "vision" issue was used by Bisignani as a pretext for improper discrimination. *Id.* at 10

Further, Putnam notes, Bisignani relied on Putnam's desire to "flatten" the depart-

ment's structure by eliminating supervisory positions as a reason for his preference of MacKay's vision for the department. *Id.* As MacKay stated during his deposition, however, he eliminated supervisory positions after becoming Chief, a position he claims to have favored. MacKay Dep. at 51. This evidence, Putnam claims, strengthens the inference that Bisignani's statement about Putnam's conflicting vision was simply a pretext for Bisignani's improper motivation. Pl.'s Mem. at 10.

Finally, Putnam cites MacKay's actions after becoming chief to support the inference that Bisignani wanted a police chief who would "support and shield" influential politicians and businessmen. *Id.* Specifically, Putnam points to (1) MacKay's "protection" of Selectman Cogliano by ordering Lieutenant DiMella not to report him to the State Ethics Commission; (2) MacKay's removal of a police log entry concerning Cogliano;[14] and (3) the fact that MacKay became upset when Bisignani and Vasapolli chided him for allegedly harassing Cogliano. *Id.* at 10–11. A jury could also infer, Putnam claims, that MacKay lacked the qualifications that Bisignani claimed he had based on the no confidence vote taken against MacKay eight months after his appointment to the permanent chief position. *Id.* at 11.

The trouble with Putnam's arguments, however, is that each suffers from the same fatal flaw. Even assuming that the inferences Putnam suggests could be drawn, he has failed to connect Bisignani's hiring decision to any of his First Amendment protected activity. Short of evidence that Putnam's protected activity was a "substantial or motivating" factor in the decision to bypass him, Putnam cannot maintain a First Amendment claim against Bisignani. *Mihos,* 358 F.3d at 102; *Tang,* 163 F.3d at 12; *O'Connor,* 994 F.2d at 913.

Putnam urges the Court to use restraint in granting summary judgment where as here, the factual question at issue is discriminatory animus. Pl.'s Mem. at 15 (citing *Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 167 (1st Cir.1998)). In such cases, Putnam argues, where the nonmoving party has produced sufficient evidence to call into question the defendant's motivation, summary judgment should be denied. *Id.* (citing *Hodgens,* 144 F.3d at 167).

There is no evidence, however, and Putnam makes no claim, that his *protected speech* was a motivating factor in Bisignani's decision to pass him over for the chief position.[15] Thus, even if Bisignani's decision was based on an "improper motivation," there is nothing beyond speculation permitting the inference that Bisignani's improper motivation was related to Putnam's protected speech. Such speculation is insufficient to defeat a motion for summary judgment. *Benoit v. Technical Manufacturing Corp.,* 331 F.3d 166, 173 (1st Cir.2003), quoting *Feliciano de la Cruz v. El Conquistador Resort & Country Club,* 218 F.3d 1, 5 (1st Cir.2000) (quotations omitted). Accordingly, summary judgment is appropriate for Putnam's First Amendment section 1983 claim

---

**14.** MacKay, however, denies that he deleted the entry. MacKay Dep. at 39–40.

**15.** The only connection Putnam draws between his activities and Bisignani's hiring decision relates to his order that Selectman Cogliano be charged with a liquor law violation. Pl.'s Mem. at 12. As discussed at length above, however, that order did not constitute First Amendment protected speech. Putnam's argument that a jury could find that some of the interview questions were based on the Kelleher incident is equally unavailing. Even if such an inference could be drawn, it does not permit the further inference that Bisignani *retaliated* against Putnam for his *report* and *testimony* related to that incident.

against Bisignani because he has failed to meet an essential element of a actionable First Amendment claim, namely a causal connection between his protected speech and the adverse employment action taken against him. *Tang,* 163 F.3d at 12 (citing *O'Connor,* 994 F.2d at 913).

### 3. Qualified Immunity

Finally, Vasapolli argues that he is entitled to summary judgment because he is protected by the doctrine of qualified immunity. Defs.' Mem. at 14. As Vasapolli points out, qualified immunity shields public officials from claims predicated on the performance of discretionary functions, insofar as that conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citations omitted). In other words, a defendant is entitled to the defense if her actions could reasonably have been thought to be consistent with the rights they are alleged to have violated. *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

■ Qualified immunity is an affirmative defense that must be pleaded by a defendant official. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). The Supreme Court has established that the defense has both an objective and subjective element. *Harlow,* 457 U.S. at 815, 102 S.Ct. 2727. The objective element presumes a defendant's knowledge of and respect for "basic, unquestioned constitutional rights." *Id.* (quoting *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)). The subjective element requires the defendant to have had impermissible intentions. *Id.* Thus, qualified immunity is defeated if either (1) "an official knew or reasonably should have known that the action" taken within her sphere of official responsibility violated the constitutional rights of a plaintiff, or (2) if she took the action with the malicious intention to cause a deprivation of constitutional rights. *Id.* (citation and internal quotation marks omitted).

■ Therefore, in assessing the merits of the defense of qualified immunity courts consider: (1) whether the facts alleged make out a constitutional violation; (2) whether that law was clearly established; and (3) whether a similarly situated reasonable official would have understood that her conduct violated clearly established law. *Savard v. Rhode Island,* 338 F.3d 23, 27 (1st Cir.2003). The central purpose of qualified immunity is to protect officials acting in good faith "from undue interference with their duties and from potentially disabling threats of liability." *Elder v. Holloway,* 510 U.S. 510, 514, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994) (quoting *Harlow,* 457 U.S. at 806, 102 S.Ct. 2727). Vasapolli argues that this purpose is especially important here given the "intimidating correspondence from Putnam's counsel." Defs.' Mem. at 15.

■ Vasapolli argues that he is shielded by qualified immunity because he did not violate clearly established law. *Id.* (citing *Fabiano v. Hopkins,* 352 F.3d 447, 452 (1st Cir.2003)). It is clear as matter of law he argues, that a reasonable Town Manager would not have known that "appointing the most experienced candidate to the chief's position" violated clearly established law. *Id.* It cannot be credibly argued, Vasapolli claims, that a reasonable Town Manager would have acted any differently than he did in making his decision or that a reasonable Town Manager would have known that bypassing Putnam violated his constitutional rights. *Id.*

According to Putnam, this argument "puts the cart before the horse." Pl.'s

Mem. at 18. That is, the law is clearly established that a government official cannot retaliate against an employee because of her protected speech. *Id.* (citing *Rankin v. McPherson*, 483 U.S. 378, 385, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)). The key issue at this juncture, Putnam notes, is Vasapolli's *motivation* for passing over him for the position. *Id.* (emphasis added). That motivation, Putnam observes, is a core issue in this case. *Id.* If, as Putnam suggests, the evidence is sufficient for a jury to infer that Putnam's constitutionally protected speech was a substantial factor in Vasapolli's decision, then such conduct would violate clearly established law. *Id.*

As a result, Putnam acknowledges, the qualified immunity defense, at least at the summary judgment phase, "rises and falls on the determination of whether the evidence is sufficient for a jury to infer that a retaliatory motivation was a substantial factor in the decision to bypass him." *Id.* Because, as discussed above, the record evidence is sufficient to permit the inference that Vasapolli retaliated against Putnam for exercising of his "basic" and "unquestioned" First Amendment rights, the doctrine of qualified immunity does not warrant summary judgment. *Harlow*, 457 U.S. at 815, 102 S.Ct. 2727 (citation omitted).

### C. Putnam's Section 1983 Claim Against The Town of Saugus

In his complaint, Putnam also asserts a First Amendment section 1983 claim against the Town of Saugus because he was passed over for the positions of temporary and permanent chief, he claims, in retaliation for his report on the Kelleher incident and Ethics Commission testimony. Compl. ¶ 52.

▌ Municipal liability under section 1983 cannot be imposed pursuant to a mere *respondeat superior* theory. *Monell*

*v. Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). That is, a municipality cannot be held liable under section 1983 solely because it employs the wrongdoer. *Id.* at 694, 98 S.Ct. 2018. Instead, municipal liability is imposed when the injury complained of results from an officially sanctioned policy or custom. *Manarite v. City of Springfield*, 957 F.2d 953, 958 (1st Cir. 1992); *Foley v. City of Lowell*, 948 F.2d 10, 14 (1st Cir.1991). Requiring a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or those whose acts may fairly be said to be those of the municipality. *Board of County Cmm'rs v. Brown*, 520 U.S. 397, 403–404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (citing *Monell*, 436 U.S. at 694, 98 S.Ct. 2018).

The Town argues that it is entitled to summary judgment on Putnam's section 1983 claim because he has "failed to establish any policy of retaliatory bypass." Town's Mem. at 14. Instead, the Town notes, Putnam's bypasses were single incidents which, without more, are insufficient for the imposition of municipal liability. *Id.* at 15 (citing *Bordanaro v. McLeod*, 871 F.2d 1151, 1161 n. 8 (1st Cir.1989) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion) and *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion))).

According to the Town, a municipal "policy" in this case would require "widespread or flagrant practices of bypassing employees for retaliatory reasons." *Id.* This understanding, however, misinterprets the definition of the term "policy" as it is explained by the Supreme Court. As Putnam correctly observes, under appropriate circumstances, municipal liability can in-

here from the single act of a municipal official. Pl.'s Mem. at 16–17 (citing *Brown*, 520 U.S. at 403–04, 117 S.Ct. 1382); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

As the Supreme Court held in *Pembaur v. City of Cincinnati*, the term "policy" does not necessarily require a widespread practice. *Id.* at 481 n. 9, 106 S.Ct. 1292. Rather, the Court observed, the term includes "a *specific decision* or set of decisions designed to carry out such a chosen course of action." *Id.* (quoting Webster's Third New International Dictionary 1754 (1981)) (emphasis added). This more nuanced definition of "policy" was necessary because the fact that "a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations." *Id.* at 481, 106 S.Ct. 1292. Thus, if an official's particular decision is made pursuant to her decision-making authority, "it surely represents an act of official government 'policy'" as that term is properly understood. *Id.*

■■■ According to a plurality of the *Pembaur* court, an official's discretion to make a decision is not enough for an imposition of municipal liability because such liability "attaches only where the decisionmaker possesses *final* authority to establish municipal policy with respect to the action ordered." *Id.* at 481–82, 106 S.Ct. 1292 (plurality opinion) (emphasis added). Thus, an official who is authorized to establish final municipal policy may give rise to municipal liability based on a specific exercise of that authority. *Id.* at 481–83, 106 S.Ct. 1292 (plurality opinion).

It is therefore plain, the *Pembaur* majority held, "that municipal liability may be imposed for a *single decision* by municipal policymakers under appropriate circumstances." *Id.* at 480, 106 S.Ct. 1292 (emphasis added). A different interpretation of the word "policy," the Court noted, would be "contrary to the fundamental purpose of § 1983." *Id.* at 481, 106 S.Ct. 1292.

In arguing for a contrary interpretation, the Town relies heavily on the recent First Circuit decision in *Fabiano v. Hopkins*. 352 F.3d at 452. In *Fabiano*, Gerald Fabiano ("Fabiano") a former Assistant Corporation Counsel for the City of Boston ("City") was fired by Merita A. Hopkins ("Hopkins"), the City's head Corporation Counsel. *Id.* at 450–451. Following his termination, Fabiano filed suit against the City pursuant to section 1983 alleging *inter alia* that his First Amendment rights had been violated. *Id.* at 451.[16]

In addressing Fabiano's municipal liability claim, the court noted that Hopkins was the relevant policymaker for purposes of section 1983 in that "the decision to terminate Fabiano's employment ultimately resided with her." *Id.* at 452. The court noted further that Fabiano pointed to no relevant city "policy" beyond the fact that Hopkins decided to fire him. *Id.* According to the First Circuit, "[a]bsent evidence of an unconstitutional municipal policy, a single incident of misconduct cannot provide the basis for municipal liability under § 1983." *Id.* (citing *Tuttle*, 471 U.S. at 823–24, 105 S.Ct. 2427 (plurality opinion)).

The sole support cited by the First Circuit for this proposition is the Supreme Court's decision in *Oklahoma City v. Tuttle*. *Id.* (citing *Tuttle*, 471 U.S. at 823–24, 105 S.Ct. 2427 (plurality opinion)). In *Tuttle*, Rose Marie Tuttle ("Tuttle"), the

---

**16.** Fabiano claimed that his termination resulted from his lawsuit challenging a decision of the City's Zoning Board of Appeal. *Id.* at 450.

widow of a man shot and killed by an Oklahoma City police officer, brought a section 1983 claim against the municipality arguing that the officer had used excessive force. *Tuttle,* 471 U.S. at 811–13, 105 S.Ct. 2427. In rejecting Tuttle's municipal liability claim, a plurality of the Court observed that "a single incident of unconstitutional activity is not sufficient to impose [municipal] liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing unconstitutional municipal policy, which policy can be attributed to a municipal policy maker." *Id.* at 823–24, 105 S.Ct. 2427 (plurality opinion).

It is this portion of the *Tuttle* opinion upon which the *Fabiano* court relied for the proposition that even though Hopkins had the ultimate authority to fire Fabiano, a single act is insufficient for the imposition of municipal liability as it could not constitute a policy. *Fabiano,* 352 F.3d at 452 (citing *Tuttle,* 471 U.S. at 823–24, 105 S.Ct. 2427 (plurality opinion)). This interpretation of *Tuttle,* however, was explicitly rejected by the Supreme Court's decision in *Pembaur,* 475 U.S. at 482 n. 11, 106 S.Ct. 1292 (plurality opinion).

In *Pembaur,* a plurality relied on *Tuttle* to note that "[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Id.* at 481–82, 106 S.Ct. 1292 (citing *Tuttle,* 471 U.S. at 822–24, 105 S.Ct. 2427 (plurality opinion)). Before holding that such discretion must be exercised pursuant to an official's final authority related to the matter within her discretion, the plurality observed:

> Respondent argues that the holding in *Tuttle* is far broader than this. It relies on the statement near the end of Justice Rehnquist's plurality opinion that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* unless proof of the incident includes proof that it was caused by an *existing,* unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." 471 U.S. at 823–24, 105 S.Ct. at 2436. Respondent contends that a policy cannot be said to be "existing" unless similar action has been taken in the past.

> This reading of the *Tuttle* plurality is strained, and places far too much weight on a single word. The plaintiff in *Tuttle* alleged that a police officer's use of excessive force deprived her decedent of life without due process of law. The plaintiff proved only a single instance of unconstitutional action by a nonpolicymaking employee of the city. She argued that the city had "caused" the constitutional deprivation by adopting a "policy" of inadequate training. The trial judge instructed the jury that a single, unusually excessive use of force may warrant an inference that it was attributable to grossly inadequate training, and that the municipality could be held liable on this basis. We reversed the judgment against the city. Although there was no opinion for the Court on this question, both the plurality and the opinion concurring in the judgment found plaintiff's submission inadequate because she failed to establish that the unconstitutional act was taken *pursuant to* a municipal policy rather than simply resulting from such a policy in a "but for" sense. *Id.,* at 822–24, 105 S.Ct. at 2435–2436 (plurality opinion), 829–830, 105 S.Ct. at 2439 (Brennan, J., concurring in part and concurring in judgment). That conclusion is entirely consistent with our holding today that the policy which ordered or authorized an unconstitutional act can be established

by a *single decision* by proper municipal policymakers.

*Pembaur,* 475 U.S. at 482 n. 11, 106 S.Ct. 1292 (first emphasis in original, second emphasis added). Thus, the plurality specifically rejected *Fabiano 's* interpretation of *Tuttle.* *Id.* The *Pembaur* majority preempted that interpretation in a broader sense by unambiguously holding that a "policy" for purposes of municipal liability may stem from a single incident of misconduct. *Id.* at 481, 106 S.Ct. 1292.

The Supreme Court revisited this issue in *Board of the County Comm'rs v. Brown,* 520 U.S. at 404, 117 S.Ct. 1382. Elaborating on its decision in *Pembaur,* the Supreme Court noted that it is not enough for an imposition of municipal liability to simply identify conduct properly attributable to the municipality. *Id.* Rather, it must be shown that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

Proof that a municipality's "authorized decisionmaker has intentionally deprived a

plaintiff of a federally protected right" the Court held, "necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken by the ... authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." *Id.* at 405, 117 S.Ct. 1382. Thus, *Brown* confirmed the notion that an official's single act can provide the basis for municipal liability so long as that act violated federal law. *Id.*

In accordance with these precedents, the First Circuit Court of Appeals has recognized the proposition that an official's single act can serve as a policy and thus establish a basis for municipal liability. *Kelley v. LaForce,* 288 F.3d 1, 9 (1st Cir. 2002) (holding that a "policy" for purposes of municipal liability may be established by an official's single decision) (citation omitted); *Dickinson v. Chitwood,* No. 98–1446, 181 F.3d 79, 1998 WL 1085684, *1 (1st Cir.1998) (citing *Pembaur,* 475 U.S. at 481, 106 S.Ct. 1292 for the proposition that a single decision by a final decision-maker may give rise to municipal liability) (unpublished opinion); [17] *Roma Constr. Co. v.*

---

17. Citation to unpublished opinions has been an issue of considerable debate, which continues until today. *See* 1st Cir. Loc. R. 32.3(b). The Eighth and Ninth Circuits are on extreme ends of the debate. *Anastasoff v. United States,* 223 F.3d 898, 899–905 (8th Cir.2000) (R. Arnold, J.), *vacated as moot,* 235 F.3d 1054 (8th Cir.2000) (en banc) (holding that unpublished opinions have precedential effect); *Hart v. Massanari,* 266 F.3d 1155, 1180 (9th Cir.2001) (Kozinski, J.) (upholding its local rule prohibiting the citation of unpublished decisions as constitutional); *see also Alshrafi v. American Airlines, Inc.,* 321 F.Supp.2d 150, 160 n. 9 (D.Mass.2004) (reviewing the holdings in *Anastasoff* and *Hart* ).

For a more complete reflection of this debate, *see* Stephen R. Barnett, *In Support of Proposed Federal Rule of Appellate Procedure*

*32.1: A Reply to Judge Alex Kozinski,* 51–DEC Fed. Law. 32, (November/December 2004); Anne Coyle, Note, *A Modest Reform: The New Rule 32.1 Permitting Citation to Unpublished Opinions in the Federal Courts of Appeals,* 72 Fordham. L.Rev. 2471 (2004); A Lawrence J. Fox, *Those Unpublished Opinions: An Appropriate Expedience or an Abdication of Responsibility?,* 32 Hofstra L.Rev. 1215 (2004); Hon. Alex Kozinski, Letter, 51–JUN Fed. Law. 36, 37 (June 2004); Gary Young, *Cite, Publish or Perish?,* Nat'l L.J., May 3, 2004, at S1.

This Court considers the reasoning of *Anastasoff* especially compelling and thus treats the holdings of unpublished opinions of the First Circuit "with great care and respect," even though the Court of Appeals itself does not accord these opinions precedential weight. *Alshrafi,* 321 F.Supp.2d at 160 n. 9;

*aRusso,* 96 F.3d 566, 576 (1st Cir.1996) (holding that an unconstitutional policy may be inferred from an official's single decision or act) (citation omitted); *Harrington v. Almy,* 977 F.2d 37, 45 (1st Cir. 1992) (citing *Pembaur,* 475 U.S. at 481–84, 106 S.Ct. 1292 to hold that a single decision can be a policy for purposes of municipal liability); *Bowen v. City of Manchester,* 966 F.2d 13, 18 (1st Cir.1992) (same); *Small v. City of Belfast,* 796 F.2d 544, 553 (1st Cir.1986) (holding that city manager's single unconstitutional action was sufficient for the imposition of municipal liability); *but see Bordanaro,* 871 F.2d at 1156–57 (holding that evidence of a single event alone cannot establish a municipal policy) (citations omitted).

The First Circuit in *Fabiano* after citing *Tuttle* made no reference to either of the Supreme Court's subsequent decisions in *Pembaur* or *Brown.* Nor did the court address any of the cases cited above from within the First Circuit. The court simply noted that because Fabiano had not "assert[ed] that the City has made a well-settled practice of punishing attorneys who have taken legal action against it or otherwise exercised their First Amendment rights," the single decision to fire Fabiano was an insufficient basis for municipal liability. *Fabiano,* 352 F.3d at 452. The *Fabiano* court implicitly reasoned that a single decision is an insufficient predicate for municipal liability because it cannot constitute a "policy." *Id.*

As the foregoing discussion demonstrates, this interpretation of the term "policy" fails to account for the precedent of the Supreme Court and the First Circuit establishing that a "policy" may be comprised of nothing more than a single act.[18] *Fabiano* notwithstanding, this Court cannot "simply disregard its sworn oath" to comply with the binding opinions of the Supreme Court. *Andrews–Clarke v. Travelers Ins. Co.,* 984 F.Supp. 49, 60 (D.Mass.1997). Accordingly, this Court is bound to apply the rule of decision of the Supreme Court that under appropriate circumstances, a government official's single act of misconduct may give rise to municipal liability. *Brown,* 520 U.S. at 404–05, 117 S.Ct. 1382; *Pembaur,* 475 U.S. at 480, 106 S.Ct. 1292; *see also Kelley,* 288 F.3d at 9.

Thus, under the rubric of *Pembaur* and its progeny, Putnam must establish that Vasapolli and Bisignani were "authorized decisionmakers" in making their respective appointments of temporary and permanent chief. *Pembaur,* 475 U.S. at 481, 106 S.Ct. 1292. This inquiry requires proof that Vasapolli and Bisignani had the authority to establish final policy regarding such appointments. *Pembaur,* 475 U.S. at 481–83, 106 S.Ct. 1292 (plurality opinion); *see also McMillian v. Monroe County,* 520 U.S. 781, 784–85, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) (noting that a majority of the Supreme Court has adopted the "final policymaking authority" requirement in municipal liability cases) (citation omitted); *Belfast,* 796 F.2d at 552–53. Further, Putnam must show that either Vasapolli or Bisignani in exercising such authority intentionally deprived him of a federally protected right. *Brown,* 520 U.S. at 404, 117 S.Ct. 1382. If such showings are made, a single act by either Vasa-

---

*Giese v. Pierce Chem. Co.,* 43 F.Supp.2d 98, 103 n. 1 (D.Mass.1999) (relying on unpublished opinions' persuasive authority).

**18.** This is not to say that municipal liability could have been imposed based on Hopkins' decision to terminate Fabiano. Rather, these precedents simply establish that a claim's dependence on a single decision does not automatically preclude the imposition of municipal liability. As explained below, for liability to be imposed based on a single decision, the decision-maker must have *final* policymaking authority regarding the matter decided.

polli or Bisignani may provide the basis for municipal liability.

As Putnam points out, the Town has gone to great lengths to show that the Town Manager, not the Board of Selectmen, is the authorized and final decision maker concerning the appointment of police chief. Pl.'s Mem. at 17. The defendants note in their Statement of Facts that the Town Manager "was the appointing authority for the position of police chief." Pl.'s Mem. at 17 (citing Defs.' Statement of Facts ¶¶ 6, 8). Additionally, in his deposition testimony, Selectman Cogliano in discussing the appointment of police chief noted, "[A]s a selectman ... we hire a town manager to do his job. We appoint him to do it. That's his duty. He has to make those decisions." Cogliano Dep. at 32. Further, according to Selectman Ciampa, regarding the appointment of police chief, "We have a very strong town manager form of government ... I let the managers manage and I don't interfere what [sic] their job is .... I keep my nose out of what their job is basically." Defs.' Statement of Facts, Ex. Y, Dep. of Christie Ciampa ("Ciampa Dep.") at 6. Bisignani himself acknowledges that the Town Manager has exclusive authority concerning the appointment of police chief. Bisignani Letter at 1.

If any question remained as to whether the Town Manager is the authorized and final authority respecting the appointment of Police Chief, Putnam argues, it is settled by the Saugus Town Charter which vests the Town Manager, not the Board of Selectmen, with the exclusive legal authority to make that appointment. Defs.' Statement of Facts, Ex. C, Saugus Town Charter ("Charter") at 2. The Town Man-

ager's appointment authority, however, must be exercised based on "merit and fitness alone." *Id.* Based on the above evidence, Putnam has shown sufficiently that Vasapolli and Bisignani were authorized decision-makers in their appointments of temporary and permanent police chief under local law. *Pembaur,* 475 U.S. at 481, 106 S.Ct. 1292.

Whether Putnam has established that Vasapolli and Bisignani had "final policy-making authority" regarding the appointments, however, is not as obvious. The existence of final policymaking authority is not matter of fact. Rather, it is matter of state and local law to be determined by the trial judge before a case is submitted to a jury. *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (citations omitted).[19] In *City of St. Louis v. Praprotnik,* a plurality of the Supreme Court attempted to provide a readily applicable framework to aid in ascertaining the location of final policymaking authority. 485 U.S. at 124–31, 108 S.Ct. 915 (plurality opinion).

According to the *Praprotnik* plurality, for an official to have final policymaking authority, their discretion cannot be "constrained by policies not of that official's making." *Id.* at 127, 108 S.Ct. 915 (plurality opinion). When an official is so constrained, "those policies, rather than the subordinate's departures from them, are the act of the municipality." *Id.* (plurality opinion). Similarly, the plurality observed, where a "subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies." *Id.* (plurality opinion).[20] The plurality further ac-

---

19. State and local law includes both "positive law" as well as well as "custom and usage" having the force of law. *Id.* (citation omitted).

20. That the State Human Resources Division had the authority to disapprove Putnam's by-pass would not be affected by this pronounce-

knowledged that "refinements of these principles may be suggested in the future ..." *Id.* (plurality opinion).

Specifically at issue in *Praprotnik* was whether a municipal architect's supervisors in the Community Development Agency had final authority to make certain personnel decisions. *Id.* at 114, 128, 108 S.Ct. 915 (plurality opinion). The plurality ruled that the supervisors lacked final authority for two reasons. *Id.* (plurality opinion). First, it noted that the supervisors' decision-making authority was not final as the municipality's mayor and aldermen were also authorized to make personnel decisions. *Id.* at 126, 128, 108 S.Ct. 915 (plurality opinion). Second, the plurality observed, the municipality's Civil Service Commission was empowered to override improper personnel decisions. *Id.* (plurality opinion).

According to the municipality's charter, all appointments must be made "on the sole basis of merit and fitness." *Id.* at 129, 108 S.Ct. 915 (plurality opinion). As the plurality pointed out, the Civil Service Commission had the final authority to interpret and enforce this provision. *Id.* at 128–29, 108 S.Ct. 915 (plurality opinion). Because this authority had not been delegated to the supervisors, they could not have final policymaking authority with respect to the personnel decisions at issue. *Id.* (plurality opinion).

*Praprotnik* was decided by only eight Justices. *Id.* at 113, 108 S.Ct. 915 (plurality opinion). The four-Justice plurality's framework for determining the existence of "final policymaking authority" was expressly rejected by an equal number of Justices. In his concurring opinion in which Justices Marshall and Blackmun joined, Justice Brennan declared the plurality's framework "unduly narrow and unrealistic, and one that ultimately would permit municipalities to insulate themselves from liability for the acts of all but a small minority of actual policymakers." *Id.* at 132, 108 S.Ct. 915 (Brennan, J., concurring).[21]

Under the plurality's finality framework, Justice Brennan observed, so long as an official's decision is subject to some form of review, however limited, that official's decisions cannot be final. *Id.* at 144–45, 108 S.Ct. 915 (Brennan, J., concurring). Justice Brennan noted further that under the plurality's framework, "a municipal charter's precatory admonition against ... employment practice[s] not based on merit and fitness effectively insulates the municipality from any liability based on acts inconsistent with that policy." *Id.* at 145 n. 7, 108 S.Ct. 915 (Brennan, J., concurring).

In responding to Justice Brennan's latter concern, the plurality denied that its ruling implied such a result. *Id.* at 130–31, 108 S.Ct. 915 (plurality opinion). Rather, the plurality reasoned, its decision merely "respect[s] the decisions, embodied in state and local law, that allocate policymaking authority among particular individuals and bodies." *Id.* at 131 (plurality opinion). An official's refusal to carry out such policies, the plurality observed "could obviously help to show that a municipality's actual policies were different from the ones that had been announced." *Id.* (plurality opinion).

ment as it is the State's not the *municipality's* policymaker.

**21.** Justice Stevens too rejected the plurality's framework in his dissenting opinion. *Id.* at 148 n. 1, 108 S.Ct. 915 (Stevens, J., dissenting) ("No matter how narrowly the Court may define the standards for imposing liability on municipalities in § 1983 litigation .... I remain convinced that Congress intended the doctrine of *respondeat superior* to apply in § 1983 litigation.").

The following term, the Supreme Court decided *Jett v. Dallas Indep. Sch. Dist.* where it incorporated principles outlined in *Praprotnik* into its majority opinion. 491 U.S. at 738, 109 S.Ct. 2702. *Jett* was the first time a majority of the Court adopted the "final policymaking authority" requirement for municipal liability claims. *Id.* at 737, 109 S.Ct. 2702. At issue in *Jett* was whether a high school principal and school superintendent had final policymaking authority regarding the termination and reassignment of a school employee. *Id.* at 705–07, 736–37, 109 S.Ct. 2702.

In its discussion of this issue, the Court noted that in *Praprotnik,* a plurality attempted to clarify the tools a court should employ in determining where policymaking authority lies. *Id.* at 737, 109 S.Ct. 2702. The Court cited *Praprotnik* to note that such an inquiry is a question of state law which includes positive law, custom, and usage. *Id.* (citation omitted). In observing that a trial judge must determine this issue, however, the Court did not cite *Praprotnik* or any other case. *Id.*

Citing its decision in *Monell v. Department of Social Servs.,* the Court noted that once the policymaking officials are identified, a jury must determine if their actions caused the deprivation at issue. *Id.* (citations omitted). The Court itself declined to resolve these issues. *Id.* at 738, 109 S.Ct. 2702. Instead, it remanded the case for a determination of which officials had final policymaking authority as to employee transfers "in light of the principles enunciated by the plurality opinion in *Praprotnik* and outlined above." *Id.*

As this Court reads *Jett,* there are at least two arguable interpretations of the effect it gives to *Praprotnik's* two-step framework for determining final policymaking authority. One interpretation is that *Jett* converts only those portions of *Praprotnik* it specifically referenced into

its majority opinion. Those portions do not include *Praprotnik's* two-step finality framework. If that framework is embodied only by a plurality of an equally divided court, it would not be binding on the lower courts. *See, e.g., Horton v. California,* 496 U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *United States v. Berry,* 636 F.2d 1075, 1078 (5th Cir.1981). A second interpretation of *Jett* is that it converts *Praprotnik* in its entirety into a majority holding. Because of the issue's significance to this case, both interpretations are discussed below.

### 1. Strict Interpretation

The Supreme Court's decision in *Jett* could be interpreted to convert only those portions of *Praprotnik* specifically cited into a majority opinion. Under this interpretation, it could be argued that *Praprotnik's* framework for determining whether an official has final decision-making authority was not incorporated by *Jett. See Terminate Control Corp., v. Horowitz,* 28 F.3d 1335, 1349 (2d Cir.1994) (failing to apply *Praprotnik's* finality framework and noting its pronouncement that final authority is determined by state law is the portion of *Praprotnik* that *Jett* expressly incorporated); Steven S. Cushman, *Municipal Liability Under § 1983: Toward a New Definition of Municipal Policymaker,* 34 B.C. L.Rev. 693, 694 n. 6 (1993) (cautioning that the ability of *Jett* to convert *Praprotnik* into a majority opinion should not be overstated as *Jett* did not require the Court to determine the issue of final policymaking authority); *see also* Erwin Chemerinsky, *Federal Jurisdiction,* § 8.5.2 at 497 (4th ed.2003) (observing that even after the Supreme Court's pronouncement in *Praprotnik* regarding final decision-making authority, which municipal officials possess such authority remains

unsettled and lower courts continue to struggle with this issue).

The *Jett* Court specifically referenced *Praprotnik* for the following propositions: (1) Whether an official has final policymaking authority is matter of state law, and (2) Relevant law includes state and local positive law as well as custom and usage having the force of law. *Jett,* 491 U.S. at 737, 109 S.Ct. 2702 (citations omitted). Curiously, the Court did not cite *Praprotnik* when it held that trial judges must determine whether an official has final authority. *Id.* More precisely, the Court failed to cite to *Praprotnik 's* two-step framework for determining whether an official has final authority. *See id.* At the end of its opinion the Court remanded the case for a determination of final policymaking authority "in light of the principles enunciated by the plurality opinion in *Praprotnik* and outlined above." *Id.* at 738, 109 S.Ct. 2702.

Arguably, one could take the position that use of the language: "the principles enunciated ... in *Praprotnik and* outlined above" limits the Court's incorporation of *Praprotnik* only to those portions that it "outlined above." *See id.* (emphasis added). That is, it is not enough that a principle was enunciated in *Praprotnik* if it was not *also* outlined by *Jett. See id.* As *Praprotnik 's* finality framework was not outlined by the *Jett* opinion, one could argue that it has not been incorporated by a majority of the Supreme Court. *See id.*

This interpretation finds some support in the Supreme Court's decision in *McMillian v. Monroe County,* 520 U.S. at 784–85, 791, 117 S.Ct. 1734. In that case the parties agreed that an Alabama sheriff had final policymaking authority in the area of law enforcement but disagreed about whether Alabama sheriffs were final policymakers for the county or the state. *Id.* at 785, 117 S.Ct. 1734. The Court concluded that Alabama sheriffs were state policymakers. *Id.* at 793, 117 S.Ct. 1734.

In reaching its conclusion, the Court noted that Alabama sheriffs "are given complete authority to enforce the state criminal law in their counties." *Id.* at 790, 117 S.Ct. 1734. The Court also noted, however, that under Alabama law, a sheriff's exercise of his or her law enforcement duties is subject to the direct control of the governor and state attorney general. *Id.* at 791, 117 S.Ct. 1734. The Court gave no indication that such control in any way hampered a sheriff's "complete authority" in that area. *See id.* Yet, under *Praprotnik 's* two-step framework, such control would appear to preempt the conclusion that a sheriff holds final policymaking authority. *Praprotnik,* 485 U.S. at 127, 108 S.Ct. 915 (plurality opinion); *McMillian,* 520 U.S. at 802, 117 S.Ct. 1734 (Ginsburg, J., dissenting) (citation omitted).

Thus, *McMillian* lends some support to the proposition that *Jett* did not make *Praprotnik 's* finality framework controlling in determining the existence of final policymaking authority. This support should not be overstated as the Court was not required to determine the issue of whether sheriffs have final authority since the parties there agreed that they do. *McMillian,* 520 U.S. at 783, 117 S.Ct. 1734.[22] Nonetheless, the Court's failure to note that such an understanding contravenes the plurality's holding in *Praprotnik* combined with the Court's characterization of the sheriff's authority as "complete" casts some doubt on the precedential force of *Praprotnik 's* finality framework. *See*

---

22. Moreover, the conclusion that sheriffs are final policymakers for the state is not as legally significant because states are not subject to liability under section 1983. *Quern v. Jordan,* 440 U.S. 332, 338, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

*McMillian,* 520 U.S. at 783, 791, 117 S.Ct. 1734.

This interpretation of *Jett* is also consistent with the case law of the First Circuit. This Court was unable to discover a single decision by the First Circuit that has either adopted or applied *Praprotnik's* two-step finality framework. Moreover, the First Circuit has reached results directly at odds with that framework.

For example, in *Silva v. Worden,* 130 F.3d 26, 31 (1st Cir.1997), although the First Circuit acknowledged *Jett's* incorporation of *Praprotnik's* proposition that final policymaking authority is matter of state law, the court did not apply *Praprotnik's* finality framework. 130 F.3d at 31 (citations omitted). Instead, the court reached a result completely at odds with that framework. *See id.* At issue in *Silva* was whether the Superintendent of the Department of Public Works had final policymaking authority regarding automobile parking in a city yard. *Id.* at 29, 31. According to the court, the superintendent lacked such authority. *Id.* at 31. Rather, the court concluded, the public works commissioner had final policymaking authority in that area. *Id.*

The First Circuit reached this result despite the municipality's code which provided that "the commissioner of public works *under the direction of the mayor and city council* shall ... have the charge of the city yard...." *Id.* (citation omitted) (alteration in original) (emphasis added). Such a result is at odds with *Praprotnik's* framework which would have foreclosed a finding of the commissioner's final policymaking authority because his decisions are both reviewable by the mayor and city counsel and subject to their policies. *Praprotnik,* 485 U.S. at 127, 108 S.Ct. 915 (plurality opinion).

Furthermore, if *Praprotnik's* method for determining final policymaking author-

ity was binding precedent, it would follow that courts uniformly must engage in the two-part inquiry as to whether an official's decisions are constrained by policies not of his or her making and whether those decisions are subject to review by a separate municipal policymaker. *Id.* Within the District of Massachusetts, however, there is no such uniformity. *See Beal v. Blache,* No. 02–cv–12447–RGS, 2005 WL 352861, *3, 2005 U.S. Dist. LEXIS 2151, *11 (D.Mass. Feb. 14, 2005) (Stearns, J.) (failing to apply *Praprotnik's* framework and holding that municipality's failure to dispute that police chief was a "high-level" official "with policymaking authority in police matters" sufficient to establish police chief's *final* policymaking authority in such matters) (citations omitted) (unpublished opinion)(emphasis added); *McCarthy v. Szostkiewicz,* 188 F.Supp.2d 64, 71 (D.Mass.2002) (Ponsor, J.) (failing to cite *Praprotnik* and holding that a mayor's admission in his deposition testimony that he was "the sole appointing authority for appointments and promotions" to the city's police department sufficient to establish mayor's final policymaking authority respecting police promotions for purposes of summary judgment); *Ford v. Suffolk County,* 154 F.Supp.2d 131, 146 (D.Mass. 2001) (Gertner, J.) (failing to cite *Praprotnik* and holding that parties' agreement that sheriff has final policymaking authority sufficient for imposition of municipal liability); *Powell v. City of Pittsfield,* 143 F.Supp.2d 94, 125 (D.Mass.2001)(failing to apply *Praprotnik* and holding that a mayor's admission that he was the ultimate decision-maker regarding police appointments sufficient to establish final policymaking authority in that area); *Martineau v. Kurland,* 36 F.Supp.2d 39, 43 (D.Mass.1999) (Keeton, J.) (applying the *Praprotnik* finality framework and holding that city hospital director lacked final poli-

cymaking authority because constrained by city's formal policy against discrimination or retribution); *Armstrong v. Lamy,* 938 F.Supp. 1018, 1035–36 (D.Mass.1996) (Keeton, J.) *rev'd on other grounds by Educadores Puertorriquenos en Accion v. Hernandez,* 367 F.3d 61 (1st Cir.2004) (recognizing *Jett's* incorporation of specific portions of *Praprotnik* but holding that school committee members have final authority to establish school policy despite fact that state law subjected such authority to "standards established by the board of education.") (citation omitted); *Gonsalves v. City of New Bedford,* 939 F.Supp. 915, 917 (D.Mass.1996) (Wolf, J.) (applying *Praprotnik's* finality framework).[23] *See also Smith v. City of Boston,* 413 Mass. 607, 612, 613–14, 602 N.E.2d 198 (1992) (Nolan, J.) (applying *Praprotnik's* finality framework and concluding that city's personnel director lacked final policymaking authority because he was constrained by policies enunciated by the mayor including the requirement that actions be taken on the basis of "merit and fitness").

### 2. Less Strict Interpretation

It could also be reasonably argued that the majority in *Jett* incorporated *Praprotnik* it its entirety including its finality framework. *See Auriemma v. Rice,* 957 F.2d 397, 400–01 (7th Cir.1992) (applying *Praprotnik's* finality framework and holding that *Jett* incorporated *Praprotnik* in its entirety); *Crowley v. Prince George's County Police Dep't,* 890 F.2d 683, 687 (4th Cir.1989) (applying *Praprotnik's* finality framework); *The Supreme Court,*

*1988 Term: Leading Case: III. Federal Statutes and Regulations,* 103 Harv. L.Rev. 320, 324 (1989) (observing that *Jett* adopted *Praprotnik's* approach for determining whether an official has final policymaking authority).

While the Court in *Jett* did not explicitly reference *Praprotnik's* two-step finality framework, it did observe that in *Praprotnik,* "we attempted a clarification of tools a federal court should employ in determining where policymaking authority lies for purposes of § 1983." *Jett,* 491 U.S. at 737, 109 S.Ct. 2702. The plurality's framework for determining an official's final policymaking authority was certainly among those "tools." Later in its opinion, the Court remanded the case to determine "where final policymaking authority ... lay in light of the principles enunciated by the plurality opinion in *Praprotnik* and outlined above." *Id.* at 738, 109 S.Ct. 2702.

It does not automatically follow as a matter of interpretation that *Jett's* final sentence limits its incorporation of *Praprotnik* to its portions specifically "outlined above." Rather, use of the word "and" in that sentence could reasonably be understood to indicate that the court must make its determination in light of those principles enunciated by the *Praprotnik* plurality *as well as* those *other* principles outlined above unrelated to *Praprotnik. See id.* (emphasis added).

Further, even if the language "and outlined above" incorporates only those por-

---

**23.** This, of course, is not the first time the judges of the District of Massachusetts have been divided on an issue. *Compare United States v. Lahey Clinic Hosp. Inc.,* 399 F.3d 1, 7 n. 4 (1st Cir.2005) (noting the existence a conflict of views within the District of Massachusetts regarding the proper interpretation of 42 U.S.C. § 405, and resolving that conflict) (unpublished opinion) *with Ortega v.*

*Star–Kist Foods, Inc.,* 370 F.3d 124, 127, 132 n. 6 (1st Cir.2004) (observing split among District of Massachusetts judges regarding class actions and whether 28 U.S.C. § 1367 provides supplemental jurisdiction over all class members' claims where the named plaintiff meets the amount-in-controversy requirement but other class members do not, and resolving that conflict).

tions of *Praprotnik* that were explicitly cited by *Jett*, one could interpret the mention of *Praprotnik's* "tools" for determining policymaking authority to include *Praprotnik's* finality framework. *See id.* at 737, 109 S.Ct. 2702. One could therefore argue that the finality framework was one of *Praprotnik's* principles "outlined" in *Jett. See id.* at 737, 738, 109 S.Ct. 2702. While this might stretch the definition of the word "outlined," such a position is certainly arguable.

While resolution of this issue is of central importance to this case and to the law of municipal liability generally, this Court expresses no opinion as to the proper interpretation of *Jett's* incorporation of *Praprotnik* as it is not necessary to decide the Town's Motion for Summary Judgment. As explained below, when assuming for present purposes that *Praprotnik's* two-step finality framework is binding precedent, it does not mandate the conclusion that Vasapolli and Bisignani lacked final policymaking authority for purposes of summary judgment.

### 3. Town Managers' Authority

 According to the Saugus Town Charter, the Town Manager is empowered to "supervise and direct the administration" of the Saugus Police Department. Charter at 2. Subject to the limitations of State law, the Town Manager is also empowered to "reorganize, consolidate or abolish" the department. *Id.* Except for school department employees, the charter vests the Town Manager with the authority to appoint and remove all officers and employees of the Town. *Id.* The Town Manager's appointment authority however, must be exercised based on "merit and fitness alone." *Id.* The Town Manager is also responsible for administering all state and local laws applicable to the Town. *Id.* at 3.

Despite the appointment authority given to the Town Manager, one could argue that it is not *final* authority under *Praprotnik* because the Town Manager is constrained by polices not of his or her making. 485 U.S. at 127, 108 S.Ct. 915 (plurality opinion) (emphasis added). That is, because the Town Manager's appointment authority must be exercised based on "merit and fitness alone," one could argue that the Town Manager's disregard of that directive is not the Town's final policy but a subordinate's departure from it. *Id.* (plurality opinion).

In *Praprotnik*, the plurality addressed this point in response to Justice Brennan's concern that a municipal charter's inclusion of "merit and fitness" language would effectively insulate the municipality from liability. *Id.* at 130–31, 108 S.Ct. 915 (plurality opinion). The plurality denied that assertion and observed that refusals to abide by a "merit and fitness" standard could help to show that a municipality's policies were in reality, different from those in the charter. *Id.* (plurality opinion). This seems to suggest that a "merit and fitness" standard would not preclude a finding of final policymaking authority in the official to whom that standard applies, if that policy is frequently disregarded. *See id.* (plurality opinion). One could then argue that Vasapolli's single alleged departure from the "merit and fitness" policy is insufficient.

This reasoning, however, is contradicted by other portions of the plurality's opinion which suggest that a "merit and fitness" standard does not automatically preclude a finding of final policymaking authority. The town charter involved in *Praprotnik* required appointment decisions as well as "all measures for the control and regulation of employment" be "on the sole basis of merit and fitness." *Id.* at 129, 108 S.Ct. 915 (plurality opinion).

Despite its recognition that the mayor was constrained by the directives of the charter, the plurality acknowledged that "one would have to conclude" that the mayor's policy decisions would be "attributable to the city itself" so long as applicable law does not make the mayor's decisions reviewable by the municipality's civil service commission. *Id.* at 126, 108 S.Ct. 915 (plurality opinion). Thus, the "merit and fitness" provision did not automatically preclude a ruling of the mayor had final policymaking authority. *Id.* (plurality opinion). Rather, the civil service commission must have the power to enforce the "merit and fitness" provision by reviewing the mayor's decisions in order to prevent such a finding. *See id.* at 126, 129, 108 S.Ct. 915 (plurality opinion).

Thus, the plurality's reasoning appears internally contradictory. One portion of the opinion implies that a "merit and fitness" standard preempts a finding of final authority, *id.* at 127, 130–31, 108 S.Ct. 915 (plurality opinion), while another part suggests it does not so long as the official's decisions are not subject to review by other municipal policymakers. *Id.* at 126, 129, 108 S.Ct. 915 (plurality opinion). One way that this apparent inconsistency can be resolved is through a closer examination of *Praprotnik's* reasoning. Such an examination suggests that the two-step framework for determining final policymaking authority may not have been intended to apply to those policymakers who are legislatively authorized to act but only to those subordinate officials to whom the legislatively empowered decision-makers have *delegated* their authority. *Id.* at 126–27, 108 S.Ct. 915 (plurality opinion) (emphasis added); *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir.2001) (citing *Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915 (plurality opinion)("a municipal employee [is not] a final policymaker unless the official's decisions are ... not

constrained by the official policies *of superior officials.*") (emphasis added)).

Before articulating its finality framework, the plurality noted that "[a]s the plurality in *Pembaur* recognized, special difficulties can arise when it is contended that a municipal policymaker has *delegated* his policymaking authority to *another official.*" *Id.* at 126 (plurality opinion) (citation omitted) (emphasis added). Indeed, the *Pembaur* plurality observed that "[a]uthority to make municipal policy may be *granted directly by a legislative enactment* or may be *delegated* by an official who possess such authority" and that policymaking authority may therefore be spread among various officers and official bodies. *Pembaur*, 475 U.S. at 483, 106 S.Ct. 1292 (plurality opinion).

To address the difficulties inherent in the delegation of authority, the *Praprotnik* plurality offered principles to provide useful guidance. *Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915 (plurality opinion). Among those principles was the plurality's two-step framework for determining final policymaking authority. *Id.* (plurality opinion). According to the plurality, "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the *subordinate's* departures from them, are the act of the municipality. Similarly, when a *subordinate's* decision is subject to review by the municipality's *authorized policymakers*, they have *retained* the authority to measure the official's conduct for conformance with their policies." *Id.* (plurality opinion) (emphasis added).

Thus, the determination that the mayor in *Praprotnik* had final policymaking authority can be reconciled with the fact that his policy decisions were subject to the charter's "merit and fitness" policy. This reconciliation stems from the fact he was

not a *subordinate* whose authority relied upon a *delegation* from *another official* but was instead provided *direct* authority by legislative enactment. *Praprotnik,* 485 U.S. at 127, 108 S.Ct. 915 (plurality opinion); *Pembaur,* 475 U.S. at 483, 106 S.Ct. 1292 (plurality opinion).

So understood, the mere inclusion of "merit and fitness" language in a municipal charter, does not prevent vesting final policymaking authority in the official whom the charter empowers. *See Praprotnik,* 485 U.S. at 126, 129, 108 S.Ct. 915 (plurality opinion). Rather, for final authority to be foreclosed, another municipal policymaker must have the power to review that official's decisions. *Id.* at 126, 129, 108 S.Ct. 915 (plurality opinion).[24]

This Court is mindful of the fact that this interpretation has the unusual effect of according different legal significance to the same legislative language depending on the person to whom it is applied. That is, as applied to the official who is legislatively empowered, it does not prevent a ruling that the individual has final policymaking authority; as applied to a subordinate to whom that policymaker delegates her authority, however, it precludes a ruling that the subordinate has final authority.

This interpretation, however, avoids reading *Praprotnik* as internally contradictory, a far more unusual result. Moreover, this understanding is better able to comply with the policy underlying municipal liability which seeks to hold the municipality accountable for the conduct of those whose acts may fairly be said to be those of the municipality. *Brown,* 520 U.S. at 403–404, 117 S.Ct. 1382 (citing *Monell,* 436 U.S. at 694, 98 S.Ct. 2018). When a local government official's decisions are unreviewable within the governing structure, those decisions may fairly be said to represent official as well as final policy because within that official's sphere of discretion, she is the vessel through which the municipality acts. *See id.* That authorizing legislation requires an official to make her decisions based on "merit and fitness alone" makes her authority no less final when that official herself is the sole determiner of whether that standard has been met. *See Praprotnik,* 485 U.S. at 126, 129, 108 S.Ct. 915 (plurality opinion); *see also, id.* at 145 n. 7, 108 S.Ct. 915 (Brennan, J., concurring); *Martinez v. City of Opa–Locka,* 971 F.2d 708, 714–15 (11th Cir.1992) (holding that under *Praprotnik,* a town charter's directive that city manager's personnel decisions be based on "merit and fitness" did not preclude city manager's final policymaking authority where no other town officials were empowered to enforce that provision); *Melton v. Oklahoma City,* 879 F.2d 706, 724–25 (10th Cir.1989) *rev'd on other grounds* 928 F.2d 920(10th Cir.1991) (holding that under *Praprotnik,* city manager had final policymaking authority regarding personnel decision despite city charter's command that all personnel decisions be made according to "merit and fitness").[25]

**24.** This refers not to the second step of the plurality's finality framework describing "when a *subordinate's* decision is subject to review by the municipality's *authorized policymakers,*" *Id.* at 127 (plurality opinion) (emphasis added). Rather, it refers to the plurality's earlier observation that "[a]ssuming applicable law" does not make the mayor's decisions reviewable by municipality's civil service commission, "one would have to conclude that policy decisions made [ ] by the mayor ... would be attributable to the city itself." *Id.* at 126 (plurality opinion). This is merely a common sense understanding of the word "final."

**25.** A different way of stating the same point is to the extent an official is not monitored for compliance with "merit and fitness" policies, the official is not actually "constrained" by such polices for purposes of *Praprotnik. See Randle v. City of Aurora,* 69 F.3d 441, 448–49

When a subordinate has only delegated authority, her acts are not as obviously attributable to the municipality. Presumably, if a subordinate failed to adhere to a "merit and fitness" standard, the delegating official could easily rescind that authority. Conversely, limiting the scope of a legislatively authorized official's authority would require the more cumbersome process of either amending or repealing the authorizing legislation. Because a subordinate's authority can be more readily taken back, her departures from required standards are not as easily characterized as those of the municipality.[26]

While this interpretation reconciles *Praprotnik's* apparent inconsistency, this Court recognizes that its two-step framework could also be interpreted to apply beyond mere instances of delegated authority. Although the plurality articulated its framework in the context of its discussion of delegation, its language did not limit its reasoning to subordinates: "When an official's discretionary decisions are constrained by policies not of that official's making *those polices* . . . *are* the act of the municipality." *Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915 (plurality opinion) (emphasis added). Thus, the opinion can fairly be read to apply to the policymaking authority of both "authorized" and "subordinate" decision-makers. *See id.* (plurality opinion); *Legal Aid Soc'y v. City of New York*, 114 F.Supp.2d 204, 233 (S.D.N.Y. 2000) (observing that under *Praprotnik*, to the extent a mayor's decisions were constrained by a separate municipal board's policy against favoritism in the procurement of contracts, such constraint could potentially prevent a finding of the mayor's final policymaking authority in that area).

Similar to the issue of *Praprotnik's* precedential force, whether its method for determining final policymaking authority applies equally to "authorized" decisionmakers and "subordinates" is no doubt crucial to the ultimate resolution of this case. At this stage, however, this Court need not determine those issues conclusively. As mentioned above, even if *Praprotnik* is governing precedent and even if its framework applies beyond instances of delegation, *Praprotnik* does not foreclose a finding that the Saugus Town Manager has final policymaking authority so as to warrant summary judgment.

It is sufficient that *Praprotnik* can be read to hold that a "merit and fitness" standard does not by itself cut off an official's final policymaking authority. *See Praprotnik*, 485 U.S. at 126, 129, 108 S.Ct. 915 (plurality opinion). Under this interpretation of *Praprotnik*, foreclosure of final policymaking authority also requires an official's decisions to be reviewable by

---

(10th Cir.1995) (holding that in determining final policymaking authority, the pertinent issue is not whether the official is *hypothetically* constrained by policies not of that official's making but whether such constraints are actually *meaningful* and citing *Melton* to note that a city charter's "merit and fitness" policy did not preclude an official's final policymaking authority) (citations omitted) (emphasis added).

26. If *Praprotnik* is binding precedent, this interpretation might help explain the District of Massachusetts decisions that have failed to apply its framework where the officials at issue were legislatively authorized to act. This interpretation would not, however, reconcile *Praprotnik* with the First Circuit's decision in *Silva v. Worden*. 130 F.3d at 31. Even if *Praprotnik's* finality framework did not govern that analysis, the finding of final policymaking authority in *Silva* conflicts with *Praprotnik's* earlier admonition that final authority cannot reside in an official's whose decisions are subject to review within municipal government. *Praprotnik*, 485 U.S. at 126, 108 S.Ct. 915 (plurality opinion); *Silva*, 130 F.3d at 31.

separate municipal officials. *Id.* at 126, 108 S.Ct. 915 (plurality opinion). Because there has been no indication that the Town Manager's appointment decisions are subject to review by other municipal officials such as the Board of Selectmen, summary judgment is not appropriate.

The record includes only a portion of the Saugus Town Charter. Within that portion the charter grants the Town Manager broad authority to "supervise and direct" the police department's administration. Charter at 2. The Town Manager is specifically empowered to make personnel decisions including the appointment of police chief. *Id.* Thus far, there has been no indication that other provisions of the charter (or any other source of law) subject the Town Manager's personnel decisions to any type of review within the municipality. To the contrary, the record evidence discussed above indicates the autonomy the Town Manager enjoys in making these decisions.

Moreover, the Town has not refuted Putnam's claim that the Town Manager has final policymaking authority and neither party has addressed the requirements of that element. Pl.'s Mem. at 16–17.[27] Accordingly, given the evidence in the record, this Court finds that the absence of final policymaking authority has not been established as matter of law. *LaSota v. Town of Topsfield,* 979 F.Supp. 45, 49 (D.Mass.1997) (Gertner, J.) (holding that where record is not fully developed, evidence that officials *likely* had final policymaking authority under state law sufficient to defeat summary judgment) (emphasis added).

Finally, Putnam has cited sufficient evidence permitting the inference

that Vasapolli, in his appointment decision intentionally deprived him of a federally protected right. *Brown,* 520 U.S. at 404–05, 117 S.Ct. 1382. As discussed at length above, Putnam has produced evidence that Vasapolli bypassed him for the temporary chief position in retaliation for his First Amendment protected activity. If believed, this provides a sufficient basis for the imposition of municipal liability because it "necessarily establishes that the *municipality* acted culpably." *Id.* at 405, 117 S.Ct. 1382 (emphasis added). Thus, the Town's further argument that Putnam's municipal liability claim fails because he is unable to establish an underlying constitutional violation by Vasapolli or Bisignani is insufficient for a grant summary judgment.

**D. Putnam's Whistleblower Act Claim Against The Town of Saugus**

In his complaint, Putnam claims the Town violated his rights under Mass. Gen. Laws ch. 149, § 185 because it passed over him for the positions of temporary and permanent chief in retaliation for his report on the Kelleher incident and for his testimony before the State Ethics Commission. Compl. ¶¶ 46–48; Pl.'s Mem. at 19–20. That statute, commonly known as the "Whistleblower Act" provides, in relevant part:

(b) An employer shall not take any retaliatory action against an employee because the employee does any of the following:

(1) Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or of another employer with whom the employee's employer has a business

27. Rather, the Town simply relied on its argument that a single act is insufficient to establish a municipal policy. Town's Mem. at 14–

15. The Town is of course, free to argue at any appropriate juncture that the Town Manager lacks final policymaking authority.

relationship, that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment;

(2) Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law, or activity, policy or practice which the employee reasonably believes poses a risk to public health, safety or the environment by the employer, or by another employer with whom the employee's employer has a business relationship; or

(3) Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment.

Mass. Gen. Laws ch. 149, § 185(b).

The Whistleblower Act gives an aggrieved employee a private right of action against a public employer, including a municipality, if the employer takes retaliatory action against her for engaging in protected activities. *Bennett v. City of Holyoke*, 362 F.3d 1, 5 (1st Cir.2004). A "retaliatory action" includes discharge, suspension, demotion, or any other action that adversely affects the terms and conditions of employment. *Id.* at 5 (citing § 185(a)(5)). Additionally, "[t]he term 'public body' is defined broadly to include legislative, judicial, administrative, and law enforcement agencies

at the federal, state, and local levels." *Id.* (citing § 185(a)(3)).

Subject to certain exceptions, Whistleblower Act protection does not apply to an employee who makes a disclosure to a public body unless the employee has brought the wrongful conduct at issue to the attention of a supervisor by written notice and gives the employer a reasonable opportunity to correct the activity.[28] § 185(c)(1). Additionally, an employee who brings suit under the Whistleblower Act waives her rights and remedies arising from the employer's same retaliatory actions "under any other contract, collective bargaining agreement, *state* law, rule or regulation, or under the common law." Section 185(f); *Bennett v. City of Holyoke*, 230 F.Supp.2d 207, 220–21 (D.Mass.2002) (Ponsor, J.) (emphasis added).

Putnam claims that his testimony before the Ethics Commission is covered by section 185(b)(2) of the statute. Pl.'s Mem. at 20. Further, Putnam asserts, his disclosure of the Kelleher incident through his written report is covered under section 185(b)(1). *Id.* at 19.

### 1. Putnam's Ethics Commission Testimony

 The Town argues that Putnam's Whistleblower Act claim against it must fail because Putnam has not established that Vasapolli and Bisignani were aware that Putnam had testified before the State Ethics Commission. Town's Mem. at 5. That is, the Town asserts, even if the State Ethics Commission is a "public body" entitling Putnam to protection under the whistleblower statute, the appointing authorities for the two positions, Vasa-

---

**28.** Putnam's report of the Kelleher incident provided such written notice because it brought to light the same conduct about which he testified before the Ethics Commission. *See Wagner*, 241 F.Supp.2d at 97–98.

Further, the employer had a "reasonable opportunity" to redress the conduct as Putnam did not testify until eleven months after his report was filed.

polli and Bisignani, were not aware that Putnam had testified before the Ethics Commission or of the substance of that testimony before making their appointment decisions. *Id.*

The Town's argument here is identical to Vasapolli's and Bisignani's argument above in relation to Putnam's First Amendment claim. For the same reasons stated above, namely that a jury could permissibly find that Vasapolli and Bisignani knew about Putnam's testimony, the Town's argument is insufficient for a grant of summary judgment of Putnam's Whistleblower claim.

The Town further argues that Putnam's Whisteblower Act claim must fail because Putnam has failed to establish a causal connection between his testimony before the Ethics Commission and the decision to bypass him. *Id.* at 6. The Town's argument here is similar to Vasapolli's and Bisignani's argument above in relation to Putnam's First Amendment claim. That is, because the Whistleblower Act requires the retaliatory act to be "because" of a plaintiff's testimony before a public body, Putnam's failure to demonstrate a causal connection between his testimony and the bypass entitles the Town to summary judgment. *Dirrane v. Brookline Police Dep't,* 315 F.3d 65, 72 (1st Cir.2002). There is, however, sufficient evidence to permit the inference that Putnam's protected speech was causally related to Vasapolli's decision to bypass him for the position.

Vasapolli told officer McGrath that he had a "problem" with Putnam because of the way he handled the Kelleher incident and for writing a report about it. McGrath Aff. ¶ 5. This was said in direct response to McGrath's assertion that he believed Vasapolli had decided to appoint MacKay to the position of temporary chief. *Id.* The substance of Putnam's Ethics Commission testimony was nearly identical to the information contained in his written report, i.e. it highlighted the improper behavior of Chief Felix and Selectman Kelleher. Compl. ¶ 23; Putnam Dep. at 78–79.

Here at the summary judgment phase all reasonable inferences must be drawn in Putnam's favor. *Perez v. Volvo Car Corp.,* 247 F.3d 303, 310 (1st Cir.2001). Because of (1) the availability of the inference that Vasapolli knew about Putnam's Ethics Commission testimony, (2) the similarity between Putnam's report and Ethics Commission testimony, and (3) the fact that Vasapolli bypassed Putnam days after his testimony, a reasonable inference is available that Vasapolli bypassed Putnam, in part, because of his testimony. While this is not conclusive proof of Vasapolli's motive, it is enough to create a genuine issue as to his motive. Fed.R.Civ.P. 56(c). Accordingly, the Town is not entitled to summary judgment on Putnam's Whistleblower Act claim.

### 2. Putnam's Report on the Kelleher Incident

██ Even if an inference was not available that Vasapolli bypassed Putnam in retaliation for his Ethics Commission Testimony, summary judgment would not be available because of the record evidence demonstrating that Vasapolli bypassed Putnam as a result of his report on the Kelleher incident.

The Whistleblower Act's prohibition of retaliation is not limited to employees' disclosures to agencies such as the Ethics Commission. Rather, the term "public body" is broadly defined to include police departments. Section 185(a)(3); *Dirrane,* 315 F.3d at 73. Thus, a police officer's internal report regarding fellow officers' misconduct qualifies as a "disclosure" to a "public body" for purposes of the Whistle-

blower Act. Section 185(b)(1); *Dirrane*, 315 F.3d at 72–73.

On the face of the statute, however, it appears that Putnam's report of the Kelleher incident cannot be shielded from retaliation unless he provided *prior* written notice of the incident to the police department. Section 185(c)(1) (emphasis added). That is, the statute requires an employee to provide written notice of the misconduct to a supervisor before disclosing it to a "public body," which in this case happens to be the police department itself. *Id.* Thus, the statute seems to mandate the paradoxical result that Putnam provide the police department with a written account of the Kelleher incident before filing his report of the incident. *Id.*

This anomaly was recognized by the First Circuit in *Dirrane v. Brookline Police Dep't*, which held that such a literal application of the statute would be at odds with its design and purpose. 315 F.3d at 73. As the First Circuit noted, the "written notice" requirement of the Whistleblower Act was intended to give the employer "an opportunity to clean up its own house before the matter was taken outside." *Id.* Where the employer itself is the public body to whom the disclosure is made, such prior written notice is not necessary. *Id.* Accordingly, the First Circuit held, the statute's requirement of written notice and an opportunity to correct is only imposed where the disclosure is made to an *outside* public body. *Id.* (emphasis

added); *see also, Wagner,* 241 F.Supp.2d at 97–98.

Thus, Putnam's report of the Kelleher incident is exempt from the statute's prior written notice requirement because such disclosure was not made to an "outside" public body. *Dirrane,* 315 F.3d at 75.[29] Because Putnam's report can be classified as a disclosure to a public body for purposes of the statute and because of the direct evidence showing that Vasapolli retaliated against Putnam for that disclosure, summary judgment concerning Putnam's Whistleblower Act claim is inappropriate.

## II. CONCLUSION

Accordingly, in light of the analysis above on January 27, 2005, Vasapolli's and Bisignani's Motion for Summary Judgment [Doc. No. 22] was DENIED as to Vasapolli and it is now ALLOWED as to Bisignani. The Town of Saugus' Motion for Summary Judgment [Doc. No. 20] is now DENIED.

SO ORDERED.

**29.** It should be noted that the same result could be reached in this case without contravening the statute's plain meaning. The prior written notice requirement applies only to disclosures made to a "public body." Section 185(c)(1). The statute's protection, however, also extends to disclosures made to a "supervisor." Section 185(b)(1). A supervisor is defined by the statute as one with "authority to direct and control the work performance of ... the employee [and] who has authority to

take corrective action regarding the violation ...." Section 185(a)(4). Felix, who was Chief of Police, appears to satisfy this definition. Assuming a protocol in which a police chief reads officers' filed reports, Putnam's report could be classified as a disclosure to a supervisor, a disclosure as to which no additional notice requirement applies. It is merely coincidental that Felix occupied the dual role of Putnam's supervisor and purveyor of the misconduct reported. .